# Illinois Official Reports

## Appellate Court

---

**People v. Brown, 2017 IL App (1st) 142197**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL BROWN, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-2197 |
| Filed<br>Rehearing denied | June 23, 2017<br>July 28, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-7098; the Hon. Maura Slattery-Boyle, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Rachel M. Kindstrand, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Eric Leafblad, and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE LAMPKIN delivered the judgment of the court, with opinion.<br>Justice Reyes concurred in the judgment and opinion.<br>Justice Hall specially concurred, with opinion. |

**OPINION**

¶ 1    Defendant Daniel Brown was found guilty by a jury of first degree murder, with a finding that he personally discharged the firearm that caused the victim's death. Defendant was sentenced to prison terms of 45 years for murder and 45 years for personally discharging the firearm that caused the death, to be served consecutively.

¶ 2    On appeal, he contends (1) the trial court committed reversible error during *voir dire* by failing to inquire when a juror indicated a lack of understanding concerning a fundamental principle about the burden of proof; (2) the trial court erred when it admitted a surveillance recording without adequate foundation and permitted a detective to offer impermissible lay opinion identification testimony concerning the recording and defense counsel was ineffective by failing to object to this evidence; (3) the trial court erred by admitting irrelevant and highly prejudicial DNA evidence, the State's closing argument concerning the DNA evidence was misleading, and defense counsel was ineffective for failing to object to the DNA evidence; (4) the statutory firearm sentencing enhancement is unconstitutionally vague and the trial court imposed an arbitrary and excessive sentence; and (5) the mittimus should be corrected to reflect one murder conviction and a 90-year prison sentence.

¶ 3    We find that the trial court's erroneous *voir dire* inquiry of one venire member concerning a *Zehr* principle and admission of a law enforcement officer's lay opinion identification testimony were not so serious as to deny defendant a fair trial. We also find that the trial court did not abuse its discretion by admitting the surveillance recording and DNA evidence. Furthermore, the statutory firearm sentencing enhancement is not unconstitutionally vague, and defendant's sentence was not arbitrary or excessive.

¶ 4    For the reasons that follow, we affirm the judgment of the circuit court and order the mittimus corrected to reflect one conviction of murder and a 90-year term of imprisonment.

¶ 5                                    I. BACKGROUND

¶ 6    This case arose from the fatal shooting of Eddie Coleman on East 79th Street in Chicago at about 10:38 p.m. on March 6, 2012. Eyewitnesses identified defendant Daniel Brown as the shooter, and he was charged by indictment with first degree murder. A jury trial was held in April and May 2014.

¶ 7    The State's evidence showed that on the date of the offense the victim was visiting his aunts, Mayblelene and Kathleen Coleman, who both lived on the 3000 block of East 79th Street. At about 10 p.m., the victim and his girlfriend, Taheerah Abdullah, walked half of a block to a store. They went inside, and the victim spoke to some men from the neighborhood, including defendant. Abdullah had known defendant for about a week and had seen him a couple of times. Abdullah heard defendant repeatedly state, "[W]hatever is gonna happen, man, is gonna happen." The victim and defendant went outside into the parking lot. Eventually, Abdullah followed them. Defendant and the victim talked and their demeanor was "kind of hostile." Abdullah stood apart from them and did not hear everything they said. Abdullah was concerned and telephoned the home of the victim's aunt, Mayblelene. Abdullah spoke with Mayblelene's daughter, Natasha Coleman, who then walked to the store.

¶ 8    Abdullah exchanged words with a woman who was with defendant, and the woman spat on Abdullah. Natasha arrived at the scene and spoke with Abdullah. Eventually, the victim joined them. They left the parking lot and headed toward Mayblelene's house. They spoke to police officers in the area about the parking lot incident, and the officers told them to go home and telephone the police to report the matter. Natasha walked toward her mother's house, followed by Abdullah and then the victim. When Natasha and Abdullah arrived at the house, the victim was no longer with them. Natasha and Abdullah went inside. Abdullah called the police and reported the parking lot incident, and Natasha sat at the dining room table.

¶ 9    Abdullah testified that when she returned to the porch to look for the victim, she heard a gunshot and saw the victim running down the street with defendant running behind him. Defendant's arm was outstretched and pointed toward the victim. Abdullah heard another gunshot followed by the victim yelling, "Ouch." Abdullah ran inside the house because she feared defendant would come after her. She heard about three more gunshots. When the gunshots ceased, Abdullah went outside and saw the victim lying motionless on the ground. His aunt, Kathleen Coleman, was with him.

¶ 10   An ambulance arrived and transported the victim to the hospital. He died from multiple gunshot wounds. He had been shot three times, once in the left side of the back, once in the upper right chest, and once in the left arm, with no evidence of close-range firing. At the time of his death, he had alcohol, cocaine, and benzoylecgonine, a breakdown of cocaine, in his system. He was 43 years old, 6 feet tall, and weighed 200 pounds.

¶ 11   Kathleen Coleman testified that she went outside around 10 p.m. to look for the victim because she had agreed to give him a ride home. She drove her car around the block and parked in front of her house. She exited her car and saw the victim running through a gangway with defendant chasing him. Kathleen testified that the area was well lit, and she could see defendant's face even though he wore a purple hoodie over his head. Kathleen testified she had known defendant for a couple of years due to his previous relationship with a girl in the area. Kathleen observed defendant shoot the victim in the back. The victim screamed, "Ouch," ran a short distance, and collapsed in the middle of the street. Defendant was running so close behind the victim that defendant had to jump over him. Defendant then turned around and shot the victim in the shoulder area. Kathleen called out, "Who is that?" so defendant would not suspect that she had recognized him. Defendant looked at her, pointed the gun into the air, and shot the light pole. Defendant ran off through a gangway. Kathleen found the victim between two cars. He was unresponsive, and Kathleen did not see a gun in his possession.

¶ 12   Natasha testified that she heard the first gunshot while she was inside her mother's house. Natasha saw Abdullah come toward her, crying. Natasha ran to the front door and onto the porch. She saw the victim being chased by defendant. She knew defendant because they had gone to school together. The victim did not have anything in his hands, but defendant held a gun in the hand of his extended arm. Natasha heard another gunshot and saw the victim fall to the ground. Defendant jumped over him and fired another gunshot toward the ground where the victim had fallen. Natasha heard Kathleen speak and then saw defendant fire a gunshot into the air. Natasha heard the gunshot hit a light pole near defendant. Defendant then ran away through a gangway.

¶ 13    Mayblelene testified that she was in her home just before 10:38 p.m. when she heard three gunshots. She heard another gunshot that sounded like it hit something iron. Abdullah ran past her to the door to see what had happened. Then Abdullah ran back past Mayblelene. Mayblelene went to the front door where Natasha was already standing and looking outside. Mayblelene saw defendant, whom she had seen several times per week in the neighborhood, run toward her house and then through a gangway with a gun in his hand. She did not see anyone else on the street with a gun and did not see anyone else run from the scene. Mayblelene had a phone in her hand and telephoned 911.

¶ 14    Detective Donald Hill and Detective John Otto arrived at the scene around 11:30 p.m. and learned that Natasha and Kathleen had witnessed the shooting. Detective Hill spoke to both women separately and each stated that the shooter's nickname was "Nu-Nu." Natasha and Kathleen were immediately transported to the police station in separate vehicles and were kept separate while they were at the police station.

¶ 15    Meanwhile, Mayblelene's niece Dominique Coleman had arrived at Mayblelene's house. Mayblelene told her that "Nu-Nu," with whom Dominique had gone to school, had shot the victim. Dominique told Officer Kevin Fry and Officer Robert Lobianco that "Nu-Nu" had shot the victim. Dominique also showed the officers a photo of "Nu-Nu" on her cell phone. The police obtained defendant's photograph from a police department computer, and Dominique identified that photograph as the person Mayblelene had said was the shooter. Officer Fry relayed information about the identification to Detective Hill and Detective Otto.

¶ 16    Detective William Meister and Detective Patrick Ford interviewed Kathleen and Natasha at the police station. Natasha was visibly upset, stated that the shooter was a person she knew as "Nu-Nu," and gave a physical description of him. Kathleen, also visibly upset, similarly identified the shooter as someone she knew as "Nu-Nu." When Detective Hill informed Detective Meister that defendant had been identified as "Nu-Nu," Detective Meister created a photo array that included a photo of defendant. Natasha and Kathleen separately viewed the photo array and identified the photo of defendant as "Nu-Nu," the man who shot the victim.

¶ 17    Detective Hill testified that he spoke with Abdullah at the scene of the shooting and learned about the verbal altercation that had occurred at the nearby store. Detective Hill and Detective Otto went to the store in the early morning hours of March 7, 2012. They had a photo of defendant, who had been identified as the shooter. Detective Hill spoke with the store manager and viewed the store's surveillance footage of the time frame shortly before the 10:38 p.m. shooting. Detective Hill viewed footage of the parking lot area outside the store and the area directly outside the store entrance. In the parking lot footage, Detective Hill saw defendant and the victim talk to each other. The victim wore a black and gray jacket, and defendant wore a black jacket over a purple hoodie. In the store entrance footage, Detective Hill saw defendant exit the store. Defendant's face, jacket, and hoodie were visible. Detective Hill identified the State's CD exhibit of the surveillance footage that a police evidence technician had downloaded from the store's surveillance equipment. The CD was published to the jury without objection.

¶ 18    The jury viewed the parking lot footage first. The date and time displayed in a corner of that footage indicated it was recorded on March 6, 2012, from about 10:17 p.m. to 10:21 p.m. Several people appeared in the parking lot area, and Detective Hill identified the victim and defendant when they initially appeared on the right side of the screen and described what they wore. Detective Hill continued to narrate that the victim and defendant initially walked

with and talked to only each other, but they were quickly joined by other people. The victim and defendant walked toward the right side of the screen and out of the view of the camera but eventually returned within the camera's view, still engaged in conversation. They walked across the parking lot, and the victim held his hands in an open manner. Then the victim and defendant moved away from each other, and the victim stood among a group of people. Defendant walked toward the group that included the victim but then walked toward the right side of screen and out of the camera's view. Eventually, the victim walked toward the left side of the screen and off camera. Defendant reemerged on the right side of screen and walked off camera in the direction taken by the victim. Then defendant reappeared on the left side of the screen and walked back toward the store entrance.

¶ 19    The jury viewed the footage of the store entrance recorded at about 10:13 p.m. Detective Hill identified defendant as he exited the store wearing a black hat and a black jacket over a purple hoodie. Detective Hill also testified that Abdullah appeared in the parking lot footage but Natasha did not. Furthermore, the recording did not show any fight between either the victim and defendant or Abdullah and the woman who allegedly spat on her.

¶ 20    On March 21, 2012, Officer Ryan Sheahan observed defendant exit a residence. Sheahan exited his car and walked up to defendant, who fled. Sheahan alerted other officers that he was in pursuit. The officers found defendant under the back steps of a residence about one-half of a mile from where Officer Sheahan had first encountered him. Defendant was placed in custody.

¶ 21    Eyewitnesses Abdullah, Kathleen, Natasha, and Mayblelene separately viewed a physical lineup. Abdullah, Kathleen, and Natasha identified defendant in the lineup as the person who shot the victim. Mayblelene identified defendant as the person she saw running from the scene with a gun.

¶ 22    Police recovered from the crime scene one fired bullet in the street, a second fired bullet on the sidewalk, and two fired cartridge casings. The bullets were .40/10 millimeter bullets, and both were fired from the same firearm. The fired cartridge casings were .40 caliber and both were fired from the same firearm. The police firearms identification expert could not determine if the fired bullets and fired cartridge casings were from the same gun. The police also recovered a purple tag that read "Akoo" in gold writing, a watch and the back to the watch, and a black clothes button.

¶ 23    Forensic DNA expert Ruben Ramos conducted polymerase chain reaction/short tandem repeat analysis of the DNA on a buccal swab collected from defendant, a blood standard from the victim, and the swabs collected from the watch, watch back, and button. Material collected from the button was insufficient to test. The DNA collected from the watch and watch back was a low-level sample. It was a mixture of human DNA profiles that were incomplete but could be separated into one minor and one major profile.

¶ 24    Ramos stated that the victim could be excluded as a contributor to both the minor and major profiles. Concerning the major profile, Ramos was able to attempt to identify only 9 of the 13 loci on the DNA molecule that form the basis for comparison and obtained results at only 6 loci plus the location that indicates the sex of the person. He explained that because he could compare only the 6 loci test results from the major profile to defendant's profile, Ramos could not state whether defendant's DNA matched the major profile found on the watch and watch back. Ramos could state only whether defendant could be excluded as a contributor to the major profile. Ramos determined that defendant could not be excluded as a

contributor to the major profile, which meant defendant was included as a contributor. Ramos calculated a frequency estimating the chance a random person would be included as a contributor to that major profile as 1 in 670,000 blacks, 1 in 580,000 whites, or 1 in 6.1 million Hispanics.

¶ 25    After the state rested, the trial court denied defendant's motion for a directed finding. Defendant then rested, and the jury heard closing arguments. The jury found defendant guilty of first degree murder, with a finding that he personally discharged a firearm that proximately caused the victim's death. The trial court denied defendant's motion for a new trial and sentenced him to 45 years in prison for the murder and an additional 45-year term for the firearm enhancement. Thereafter, the trial court denied defendant's motion to reconsider the sentence.

¶ 26                                II. ANALYSIS

¶ 27    On appeal, defendant argues (1) the trial court committed reversible error during *voir dire* by failing to inquire when a venire member who became a juror indicated a lack of understanding concerning a principle about the burden of proof; (2) the trial court erred when it admitted the store surveillance recording without an adequate foundation and permitted Detective Hill to testify about the content of the recording and identify the victim and defendant, and defense counsel was ineffective by failing to object to this evidence; (3) the trial court erred by admitting irrelevant and highly prejudicial DNA evidence, the State's closing argument concerning that evidence was misleading, and defense counsel was ineffective for failing to object to the DNA evidence; (4) the statutory firearm sentencing enhancement is unconstitutionally vague and the trial court imposed an arbitrary and excessive sentence; and (5) the mittimus should be corrected to reflect one conviction for murder and a sentence of 90 years' imprisonment.

¶ 28                             A. *Voir Dire*

¶ 29    Defendant contends the trial court committed reversible error by failing to conduct an adequate *voir dire* of venire member L.L., who indicated she did not understand a fundamental principle of the right to a fair trial before an impartial jury but nevertheless was deemed qualified to serve on the jury. Specifically, L.L. indicated during *voir dire* that she did not understand the principle that the presumption of innocence stays with the defendant throughout the trial and is not overcome unless the State proves the charges against the defendant beyond a reasonable doubt. Defendant argues the judge failed to conduct any further inquiry concerning L.L.'s understanding and acceptance of this fundamental principle. Defendant also argues the judge conducted "a wholly inadequate *voir dire* of L.L." and then erroneously concluded that L.L. merely meant she had trouble understanding English and her answers to general questions, which the judge had posed to all the venire members, demonstrated that L.L. did not struggle to comprehend English. Defendant asserts that the trial judge's failure to inquire into L.L.'s understanding of the fundamental principle and failure to adequately inquire into L.L.'s comprehension of English deprived defendant of his right to a fair trial before an impartial jury.

¶ 30    Defendant has forfeited review of this issue by failing to both timely object and include this issue in his motion for a new trial. *People v. Denson*, 2014 IL 116231, ¶ 11. However, he asks us to review this issue under the plain error doctrine, arguing that the error was so

serious that it affected the fairness of his trial and challenged the integrity of the judicial process.

¶ 31 We may review claims of error under the plain error rule, which is a narrow and limited exception to forfeiture. *People v. Hiller*, 237 Ill. 2d 539, 545 (2010); Ill. S. Ct. R. 615(a). To obtain relief under this rule, a defendant must show that a clear or obvious error occurred. *Id.* The defendant bears the burden of persuading the court that either (1) the evidence at the hearing was so closely balanced (regardless of the seriousness of the error) as to severely threaten to tip the scales of justice against the defendant or (2) the error was so serious (regardless of the closeness of the evidence) as to deny the defendant a fair trial and challenge the integrity of the judicial process. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). In order to determine whether the plain error doctrine should be applied, we must first determine whether any error occurred. *Id.*

¶ 32 In *People v. Rinehart*, 2012 IL 111719, our supreme court discussed the right to an impartial jury encompassed within the constitutional right to a jury trial.

> "The trial court is primarily responsible for initiating and conducting *voir dire* ***. Because there is no precise test for determining which questions will filter out partial jurors [citation], the manner and scope of the examination rests within the discretion of the trial court, and we review such decisions for an abuse of discretion. An abuse of discretion occurs when the conduct of the trial court thwarts the purpose of *voir dire* examination—namely, the selection of a jury free from bias or prejudice. [Citation.]; *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993) ('[t]he purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath'); see also *People v. Clark*, 278 Ill. App. 3d 996, 1003 (1996) ('The purpose of *voir dire* is to enable the trial court to select an impartial jury and to ensure that the attorneys have an informed and intelligent basis on which to exercise peremptory challenges.'). Stated differently, a trial court does not abuse its discretion during *voir dire* if the questions create 'a reasonable assurance that any prejudice or bias would be discovered.' *People v. Dow*, 240 Ill. App. 3d 392, 397 (1992)." *Rinehart*, 2012 IL 111719, ¶ 16.

¶ 33 Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) requires the trial court to ask prospective jurors if they understand and accept that (1) a defendant is presumed innocent, (2) the State must prove the defendant guilty beyond a reasonable doubt before he can be convicted, (3) the defendant is not required to offer any evidence in his own behalf, and (4) if a defendant does not testify on his own behalf, it cannot be held against him. "The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in [Rule 431(b)]." *Id.* The trial court's questioning of the venire concerning these four principles, which are commonly referred to as the *Zehr* principles, is intended to ensure compliance with *People v. Zehr*, 103 Ill. 2d 472, 477 (1984), which sought to end the practice where the judge made a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law. Ill. S. Ct. R. 431, Committee Comments.

¶ 34 According to the record, the trial court questioned the venire concerning the first *Zehr* principle and no one raised a hand to indicate a lack of understanding or lack of agreement

with the first principle. When the court asked if anyone in the venire did not understand and accept the second principle that the presumption of innocence stays with the defendant throughout the trial and is not overcome unless, from all the evidence, the juror believes the State proved defendant's guilt beyond a reasonable doubt, juror L.L. raised her hand. The following occurred:

"THE COURT: Ms. [L.L.]?

[L.L.]: I don't understand.

THE COURT: I'll get to that in a second. Other than Ms. [L.L.], is there anyone that does not understand and accept that principle? Please raise your hand at this time. The second [*Zehr*] question has been asked; no one has raised their hand."

¶ 35    The trial court continued to question the venire concerning the third and fourth *Zehr* principles and no one raised a hand to indicate a lack of understanding or acceptance. Then the judge questioned five venire members before questioning L.L.

¶ 36    The judge asked L.L. a series of questions about her age, employment, education, residence, marital status, and whether she, a family member or close friend had been a victim of a crime, involved in a criminal case, or a party to a lawsuit. The judge asked L.L. if she knew any lawyers, judges, or police officers; whether she ever visited anyone who was detained or incarcerated; and how she generally received her news information. L.L.'s responses were in English, brief, and generally one-word answers. Furthermore, L.L. responded affirmatively when the judge asked whether she would weigh the credibility of witness testimony without regard to the witness's occupation and would listen to all the evidence and apply the law as instructed by the court in a fair and impartial manner.

¶ 37    Thereafter, the judge questioned eight more venire members. In chambers, the judge granted the State's request to strike a venire member for cause. Then the judge stated:

"One preliminary matter. Ms. [L.L.] While beginning questioning she raised her hand indicating—she stated that she had trouble understanding English. The Court placed the same questions to her as every other juror, she answered appropriately. She did not indicate at any time struggling with anything, so the Court will not strike her for cause."

Defense counsel did not voice any concern or disagreement with the judge's characterization of why L.L. stated "I don't understand" and did not suggest that the court follow up with any questions to L.L. about her understanding of the *Zehr* principles or ask that she be excused for cause. Defense counsel accepted L.L. as a juror despite having the opportunity to use a peremptory challenge to strike her.

¶ 38    The State argues the trial court complied with Rule 431(b) by asking the venire members if they understood and accepted the four *Zehr* principles, and the trial court had no reason to question L.L. further because the record supports a conclusion that when L.L. said, "I don't understand," she was referring to or claiming some difficulty in understanding English.

¶ 39    We find that an error occurred because the trial court failed to comply with Rule 431(b). However, we find no abuse of discretion in the trial court's conclusion that the *voir dire* of L.L. demonstrated she did not struggle to understand English and thus was competent to serve as a juror. After L.L. indicated a failure to understand when questioned about the second *Zehr* principle, the trial judge said she "would get to that in a second," but never asked L.L. any further questions about her understanding of the question or the second *Zehr*

principle. Furthermore, the trial judge may have created confusion when she exempted L.L. from the question about the second *Zehr* principle. Specifically, the judge continued questioning the venire by stating, "Other than Ms. [L.L.], is there anyone that does not understand and accept [the second *Zehr*] principle?" It would have been possible for L.L. to construe her exemption from answering that question as also applying to the questions concerning the third and fourth *Zehr* principles.

¶ 40    Despite the trial court's error in failing to ascertain whether L.L. understood and agreed with the second *Zehr* principle and possibly the third and fourth *Zehr* principles, we disagree with defendant's assertion that the trial court's *voir dire* of L.L. was "wholly inadequate." L.L.'s answers to the judge's questions were appropriate, *albeit* brief, and demonstrated L.L.'s comprehension of the English language. L.L. even asked for clarification when she did not understand the judge's question concerning the source of L.L.'s news information. Further, the judge's questions concerning any involvement by L.L. or her family in litigation, or whether she knew any lawyers, judges, or police officers created a reasonable assurance that any prejudice or bias of L.L. would have been discovered. In addition, L.L. responded that she would weigh witness credibility equally regardless of the witness's occupation, listen to all the evidence, and apply the law as instructed by the court and in a fair and impartial manner. We find no abuse of discretion concerning the trial judge's conclusion that the *voir dire* of L.L. demonstrated she did not struggle with English comprehension.

¶ 41    Defendant, who has raised only the second prong of plain error, fails to cite relevant authority to support his assertion that L.L.'s "I don't understand" statement meant she admitted a "lack of understanding of one of the essential qualifications of a juror" and thus was unqualified to serve as a juror in this case. We conclude that the trial court's error in failing to comply with Rule 431(b) concerning the questioning of L.L. was not so serious as to deny defendant a fair trial. In the absence of any evidence of juror L.L.'s bias offered by defendant, who carries the burden of proving plain error, we will not presume that L.L. was biased against him. *People v. Thompson*, 238 Ill. 2d 598, 614-15 (2010) (noting that violation of Rule 431(b) does not implicate a fundamental right or constitutional protection but involves only the failure to comply with a court rule). As discussed above, the trial court's *voir dire* of L.L. created a reasonable assurance that any bias or prejudice held by L.L. would have been discovered. Furthermore, L.L.'s "I don't understand" statement indicated that she did not understand the *question posed* concerning the second *Zehr* principle and was not the equivalent of a rejection of the second *Zehr* principle itself. Accordingly, we reject defendant's attempt to invoke the second prong of plain error.

¶ 42    The special concurrence misconstrues the analysis of the majority and the issue raised by defendant concerning the trial court's *voir dire* of L.L. The special concurrence erroneously states the trial court concluded L.L.'s *voir dire* "demonstrated that she did not understand English." *Infra* ¶ 91. Also, the special concurrence erroneously contends defendant asserts that the trial court failed to comply with Rule 431(b) by failing to inquire into L.L.'s understanding and agreement with the second *Zehr* principle. Defendant, however, repeatedly contested such a characterization of his argument on this issue in both his initial and reply briefs before this court.

¶ 43    Specifically, defendant expressly argued that the abuse of discretion standard of review applied to his issue of "[w]hether the trial judge properly conducted *voir dire* in order to 'filter out' unqualified jurors." Furthermore, in his reply brief, defendant criticized the State

for attempting to analogize his argument to cases that considered whether the trial court's failure to comply with Rule 431(b) was reversible error. Defendant emphasized that "[i]t is not the trial court's recitation of the *Zehr* principles that is at issue; it is whether L.L.'s admitted lack of understanding of one of the essential qualifications of a juror, and the trial court's failure to properly question her about that lack of understanding, resulted in the seating of an unqualified juror in [defendant's] case." Thereafter, defendant argued the State is "wrongly recasting [defendant's] argument as one based on whether the trial court's recitation of the *Zehr* principles complied with Rule 431(b)," and again insisted that "the issue is not whether the trial court recited the *Zehr* principles correctly, but whether the court's failure to properly investigate L.L.'s lack of understanding of an essential juror qualification, and the seating of an unqualified juror, constitutes reversible error." Defendant clearly is aware that a trial court's failure to comply with Rule 431(b) does not constitute second prong plain error and, thus, expends much effort to dispel any notion that he is raising such a claim.

¶ 44     Defendant's issue that the *voir dire* of juror L.L. was "wholly inadequate" is intertwined with the issue of whether the trial court complied with Rule 431(b) and is raised in the context of second-prong plain error review. Accordingly, the majority reviewed *de novo* the trial court's compliance with Rule 431(b) and reviewed the trial court's *voir dire* of L.L. for an abuse of discretion.

¶ 45     Alternatively, defendant argues he was denied effective assistance of counsel because counsel failed to preserve this error for review. Defendant argues counsel should have either requested that the trial judge examine L.L. based on her "I don't understand" statement or otherwise objected to her being seated on the jury.

¶ 46     In order to prove a claim of ineffective assistance of counsel, a defendant must satisfy both prongs of the test discussed in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which requires a showing that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *People v. White*, 2011 IL 109689, ¶ 132. To satisfy the first prong, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. The second prong requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Failure to establish either counsel's deficient performance or prejudice resulting to defendant precludes a finding of ineffective assistance of counsel. *Id.* at 697. If a defendant cannot establish prejudice, the reviewing court need not determine whether counsel's performance fell below the objective standard of reasonableness. *Id.*

¶ 47     In reviewing a claim of ineffective assistance of counsel, this court reviews counsel's actions under the totality of the circumstances of the individual case. *People v. Shatner*, 174 Ill. 2d 133, 147 (1996). Judicial scrutiny of counsel's performance is highly deferential, and counsel's trial strategy is given a strong presumption of reasonable professional assistance. *Strickland*, 466 U.S. at 689. To establish deficient performance, defendant must identify counsel's acts or omissions that allegedly are not the result of reasonable professional judgment and overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy. *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007); *Strickland*, 466 U.S. at 690. "A fair assessment of attorney performance requires that every effort be made to

eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Defendant must show that counsel's errors were so serious and his performance was so deficient that he did not function as the counsel guaranteed by the sixth amendment. *Perry*, 224 Ill. 2d at 342.

¶ 48 The decision to exercise an available peremptory challenge is a strategic one and generally not subject to scrutiny under *Strickland*. *People v. Metcalfe*, 202 Ill. 2d 544, 561-62 (2002). According to the record, defense counsel challenged potential jurors for cause and exercised peremptory challenges. Defendant fails to show that counsel's decision to accept L.L. was not tactical and a matter of jury selection strategy. It is possible counsel considered that L.L.'s *voir dire* responses indicated she would not favor the State in weighing the credibility of its many police officer and forensic evidence witnesses. Furthermore, we have rejected defendant's contentions that the *voir dire* of L.L. was "wholly inadequate" and she was not qualified to serve as a juror. Thus, counsel's decision not to challenge L.L. for cause was not objectively unreasonable. In addition, the evidence was more than sufficient to prove defendant guilty beyond a reasonable doubt, and there was no evidence that L.L. rejected the principle that the State does not overcome defendant's presumption of innocence unless the State proves his guilt beyond a reasonable doubt. We find no merit in defendant's claim of ineffective assistance of counsel.

¶ 49 B. Surveillance Recording

¶ 50 Defendant argues the State failed to lay an adequate foundation for introduction of the surveillance recording of the store parking lot where defendant and the victim exchanged words prior to the shooting on 79th Street. Further, defendant contends it was improper to allow Detective Hill to recount or narrate the contents of the recording as it was played for the jury because it constituted inadmissible lay witness identification testimony. Defendant, however, did not object to the introduction of the recording or Detective Hill's testimony identifying defendant and the victim in that recording and describing their movements. Defendant concedes he has forfeited review of these issues on appeal but asks us to review these claims under the second prong of the plain error doctrine because the errors were so serious as to deprive him of a fair trial. Alternatively, defendant argues trial counsel was ineffective by failing to timely object and preserve these claims for review.

¶ 51 In order to determine whether the plain error doctrine should be applied, we must first determine whether any error occurred. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). We review the trial court's decisions to admit the surveillance recording and Detective Hill's testimony concerning the recording for an abuse of discretion, which occurs when the trial court's ruling is fanciful, unreasonable, or when no reasonable person would adopt the trial court's view. *People v. Taylor*, 2011 IL 110067, ¶ 27. The forfeiture rule is "particularly appropriate" when a defendant claims the State failed to lay a proper foundation. *People v. Woods*, 214 Ill. 2d 455, 470 (2005). In that circumstance, "a defendant's lack of a timely and specific objection deprives the State of the opportunity to correct any deficiency in the foundational proof at the trial level." *Id.*; *People v. Johnson*, 2016 IL App (4th) 150004, ¶¶ 70-71. Had defendant objected, the State would have had the opportunity to elicit additional foundational evidence or testimony.

¶ 52     First, defendant argues the State failed to lay an adequate foundation for admission of the surveillance recording because the State failed to present any evidence that the store's surveillance device was capable of recording and generally reliable, that the operator of the device was competent, and that the device was operating properly.

¶ 53     Automatic surveillance recordings present the prototypical situation for application of the silent witness theory. *Taylor*, 2011 IL 110067, ¶ 32. This theory allows the recordings to be introduced as substantive evidence as long as a proper foundation is laid; "a witness need not testify to the accuracy of the image depicted in the [recording] if the accuracy of the process that produced the evidence is established with an adequate foundation." *Id.* In determining whether an adequate foundation has been laid for a surveillance recording, courts consider (1) the device's capability for recording and general reliability; (2) competency of the operator; (3) proper operation of the device; (4) showing the manner in which the recording was preserved (chain of custody); (5) identification of the persons, locale, or objects depicted; and (6) explanation of any copying or duplication process. *Id.* ¶ 35. This list of factors is not exclusive, and some factors may not be relevant depending on the facts of the case. *Id.* "The dispositive issue in every case is the accuracy and reliability of the process that produced the recording." *Id.*

¶ 54     We find no error occurred regarding the admission of the surveillance recording. Detective Hill testified that he learned from eyewitnesses at the scene of the shooting on 79th Street about the encounter between the victim and defendant at the nearby store. Detective Hill promptly went to that store with a photograph of defendant to investigate whether any automatic surveillance devices recorded images of defendant and the victim. Detective Hill spoke with the store manager, who operated the equipment and showed Detective Hill surveillance footage of the front door and outside areas of the store taken on March 6, from about 10:12 p.m. until 10:30 p.m. After Detective Hill viewed the footage, he called for a police evidence technician, who came to the store and downloaded the footage viewed by Detective Hill onto a CD. At the trial, Detective Hill testified that the recording played for the jury was the same footage Detective Hill had viewed at the store. Furthermore, the parties stipulated that the CD contained recorded footage that truly and accurately depicted the scene on March 6, 2012, from approximately 10:12 p.m. to 10:30 p.m.; there had been no tampering, editing, or deletion of the March 6 recorded footage; and a proper chain of custody was maintained at all times.

¶ 55     The evidence showed that Detective Hill promptly sought the surveillance footage after the shooting, the store manager retrieved from the store's surveillance device the recorded footage for the particular date and time frame requested by Detective Hill, the manager showed Detective Hill the relevant footage, and the recording was downloaded to preserve that evidence. Those facts were evidence that the store's automatic surveillance recording device was functional, able to record, and generally operating properly and that the store manager knew how to operate the device. See *Taylor*, 2011 IL 110067, ¶ 39. Based on those facts and the parties' stipulation concerning the surveillance recording, the State provided sufficient proof of the reliability of the process that produced the recording and thus laid a sufficient foundation for its admission. Accordingly, we reject defendant's claims of second prong plain error and ineffective assistance of counsel concerning the admissibility of the surveillance recording.

¶ 56    Next, defendant argues that Detective Hill's testimony regarding the contents of the surveillance recording was inadmissible lay opinion identification testimony. Specifically, defendant argues nothing in the record suggested Detective Hill had any familiarity with defendant before or after the shooting, so there was no basis to conclude Detective Hill was more likely to correctly identify defendant from the surveillance recording than the jury. Defendant contends Detective Hill's narration of the surveillance recording was not helpful to either a clear understanding of his testimony or a determination of a fact in issue. Defendant states that "the trial court did not engage in any precautionary procedures to screen Detective Hill's testimony before it was heard by the jury," and thus a member of the police improperly vouched for the State's case by identifying defendant as being near the scene of the shooting and interacting with the victim. Defendant contends this error likely affected the way the jury viewed the recording and evaluated the eyewitnesses' credibility and, thus, denied him a fair trial.

¶ 57    The State responds that Detective Hill's identification testimony was helpful to the jury and thus admissible because defendant and the victim appeared in the recording briefly and they were dressed in manner similar to numerous other men in the recording. Furthermore, they were moving around, the recording was "somewhat grainy," and the colors of people's clothing were "extremely muted." The State contends Detective Hill was able to take his time viewing the store surveillance footage and was able to identify the exact time frame in which defendant and the victim were in that location and the directions they took after their encounter. The State asserts Detective Hill's prior viewings of the recording enabled him to identify defendant and the victim in the recording in a more efficient manner than the jury would have been able to do. The State contends it would have been an extremely inefficient use of the jury's and the court's time to view the recording without Detective Hill's helpful identification testimony.

¶ 58    A lay witness may only testify to events of which he has personal knowledge. Ill. R. Evid. 602 (eff. Jan. 1, 2011). Such testimony must be "(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Ill. R. Evid. 701 (eff. Jan. 1, 2011). Further, Illinois Rule of Evidence 704 (eff. Jan. 1, 2011) provides, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

¶ 59    Lay witness identification testimony is admissible if "(a) the testimony was rationally based on the perception of the witness and (b) the testimony is helpful to a clear understanding of the witness's testimony or a determination of a fact in issue." *People v. Thompson*, 2016 IL 118667, ¶ 50. Such "testimony is helpful where there is some basis for concluding the witness is more likely to correctly identify the defendant from the surveillance recording than the jury. A showing of sustained contact, intimate familiarity, or special knowledge of the defendant is not required. Rather, the witness must only have had contact with the defendant that the jury would not possess to achieve a level of familiarity that renders the opinion helpful." *Id.*

¶ 60    To determine whether the testimony is helpful, courts view the totality of the circumstances and consider "the witness's general familiarity with the defendant; the witnesses' familiarity with the defendant at the time the recording was made or where the

- 13 -

witness observed the defendant dressed in a manner similar to the individual depicted in the recording; whether the defendant was disguised in the recording or changed his/her appearance between the time of the recording and trial; and the clarity of the recording and extent to which the individual is depicted. However, the absence of any particular factor does not render the testimony inadmissible." *Id.* ¶ 51. "[T]he extent of a witness's opportunity to observe the defendant goes to the weight of the testimony, not its admissibility." *Id.* ¶ 53. However, testimony admissible under the foregoing principles "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." (Internal quotation marks omitted.) *Id.* ¶ 54.

¶ 61　　Courts considering admitting the identification testimony of law enforcement officers "should afford the defendant an opportunity to examine the officer outside the presence of the jury" and "properly instruct the jury, before the testimony and in the final charge to the jury, that it need not give any weight at all to such testimony and also that the jury is not to draw any adverse inference from the fact the witness is a law enforcement officer if that fact is disclosed." *Id.* ¶ 59. These precautionary procedures will safeguard the defendant's right to cross-examine the officer concerning his familiarity with the defendant and any bias or prejudice without revealing to the jury the defendant's criminal record. *Id.* ¶¶ 57-59.

¶ 62　　Here, although Detective Hill was not present at the store when the victim and Abdullah encountered defendant and other people, Detective Hill's testimony included narrating portions of the recording in addition to identification testimony. Putting aside for the moment Detective Hill's identification testimony, we find that his perceptions did not need to be based on the live event at the store because he was not providing an eyewitness account; rather, his testimony was relevant to the scenes depicted in the recording. Consequently, he needed to have perceived only the recording, and this testimony merely laid an evidentiary foundation for admission of the surveillance recording. See *id.* ¶¶ 8, 61 (law enforcement officer's testimony describing the actions of "the subject" in the surveillance recording did not identify the defendant as the individual depicted in the recording and thus was not lay opinion identification testimony).

¶ 63　　Detective Hill's testimony concerning the interactions and movements of particular subjects shown in the parking lot footage was helpful to the jury due to a certain lack of clarity of the recording. Specifically, Detective Hill's testimony helped the jury focus on the relevant action because numerous people entered and exited the parking lot area, their faces were too distant from the camera to be discernible, their outdoor winter clothing somewhat concealed their identities, and the color of their clothing was muted. Compare *United States v. LaPierre*, 998 F.2d 1460, 1465 (9th Cir. 1993) (law officer's testimony identifying the defendant as the individual pictured in the bank surveillance photographs was not helpful to the jury because the officer had never seen the defendant in person and was familiar with his appearance only through other photographs and witnesses' descriptions), with *United States v. Begay*, 42 F.3d 486, 502 (9th Cir. 1994) (law officer's testimony narrating portions of a video of a protest involving about 200 demonstrators and identifying the defendants' movements helped the jury evaluate the recording where an array of events occurred simultaneously and the officer spent over 100 hours viewing the recording).

¶ 64　　The record, however, does not indicate that Detective Hill had any familiarity with defendant beyond the eyewitness descriptions of what the shooter wore, eyewitness statements that defendant was the shooter, and a photograph of defendant from police

computer files. Nothing in the record indicates how long Detective Hill reviewed the recording in order to discern defendant. The record also fails to show that Detective Hill had any familiarity with the victim. Consequently, we find the record does not demonstrate a basis that might lead one to conclude Detective Hill was more likely to correctly identify defendant and the victim in the recording than the jury. Furthermore, Detective Hill provided his identification testimony without the trial court first engaging in precautionary procedures to safeguard defendant's right to confrontation. *Thompson*, 2016 IL 118667, ¶¶ 62, 65 (the trial court erred in admitting the identification testimony of law enforcement officers without first engaging in precautionary measures). Thus, the admission of Detective Hill's identification testimony was error.

¶ 65    Nevertheless, we conclude that this error does not constitute plain error. Abdullah, Kathleen, and Natasha saw defendant chase the victim on 79th Street and shoot him with the gun defendant held in the hand of his extended arm, and Mayblelene heard gunshots and saw defendant run toward her house and through a gangway holding a gun in his hand. All four witnesses testified that they were familiar with defendant prior to the shooting. Detective Hill's identification testimony merely lent some support to Abdullah's testimony about the encounter between defendant and the victim at the store near the scene of the shooting approximately 20 minutes before the shooting occurred. Moreover, Detective Hill's identification testimony went only to the identification of defendant at the nearby store; it did not extend to the crime itself, which was outside the scope of the surveillance recording. Any prejudice from the erroneous admission of Detective Hill's identification testimony was not so severe as to have denied defendant a fair trial.

¶ 66    Alternatively, defendant argues he was denied effective assistance of counsel because counsel failed to preserve this error for review. As discussed in *supra* ¶¶ 46-47, in order to establish a claim of ineffective assistance of counsel, defendant must show that counsel's failure to object to the admission of Detective Hill's identification testimony was objectively unreasonable and resulted in prejudice to defendant. The record indicates the admission of Detective Hill's identification testimony from the surveillance recording supported the defense strategy to attack the eyewitnesses' testimony because the recording did not show a fight between the victim and defendant, or between Abdullah and the woman who allegedly spat on her, and the recording did not show Natasha at the scene of the store. Furthermore, defendant cannot establish prejudice resulting from counsel's decision not to challenge Detective Hill's identification testimony because the State simply could have admitted the store parking lot identification testimony through Abdullah, who observed the parking lot encounter between defendant and the victim and is shown in the surveillance recording.

¶ 67    We conclude defendant fails to demonstrate a claim of ineffective assistance of counsel concerning Detective Hill's identification testimony.

¶ 68                              C. DNA Evidence

¶ 69    Defendant argues the trial court erred in admitting irrelevant DNA evidence that was based on an only six-loci analysis of the major DNA profile found on the low-level sample obtained from the watch and watch back recovered from the scene. Defendant argues the evidence that his DNA could not be excluded from the major DNA profile was irrelevant because the six-loci analysis is far less than what is generally accepted in the scientific community for a match or even a partial match and DNA evidence plays "an outsized role in

the minds of a jury evaluating a defendant's case." Defendant also argues that Ramos's statistical analysis was irrelevant and highly prejudicial because his testimony established that it was more likely that an unrelated white male would be a contributor to the major profile than a black male such as defendant. Furthermore, defendant contends the State erroneously argued to the jury that the DNA affirmatively linked defendant to the crime scene when the prosecutor used an analogy to quantify Ramos's statistical analysis.

¶ 70    Defendant concedes he forfeited review of this issue and asks this court to review it under the second prong of the plain error doctrine. Defendant argues the error in this case was serious because jurors tend to place undue weight on DNA evidence and the prosecutor's characterization of the DNA evidence was misleading and improperly implied a match to defendant even though Ramos's analysis did not support that argument. Alternatively, defendant argues trial counsel was ineffective for failing to object to the admission of the DNA evidence on relevancy grounds or meaningfully challenge the reliability of Ramos's testimony and statistical analysis.

¶ 71    In order to determine whether the plain error doctrine should be applied, we must first determine whether any error occurred. *Herron*, 215 Ill. 2d at 187. The decision whether evidence is relevant and admissible is within the trial court's discretion and will not be reversed absent a clear abuse of discretion. *People v. Morgan*, 197 Ill. 2d 404, 456 (2001). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Relevant evidence may be excluded as unduly prejudicial only where "its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 72    DNA expert Ramos explained to the jury that 13 loci on the DNA molecule are used as a basis of comparison between DNA samples and standards, but samples may be degraded due to conditions like exposure to the elements and may not yield complete profiles when tested. Ramos clearly testified that the major profile obtained from the low-level sample found on the watch and watch back was not a complete profile. He also clearly testified that he could not state whether defendant's DNA matched the major profile because Ramos obtained results at only 6 loci plus the location that indicates the sex of the person. Ramos testified that based on the only 6-loci analysis, he could determine only that defendant could not be excluded as a contributor to the major profile, which meant defendant was included in the group of potential contributors. Ramos calculated the frequency which estimated the chance a random person would be included as a contributor in that major DNA profile and found that 1 in 670,000 black, 1 in 580,000 white, or 1 in 6.1 million Hispanic unrelated individuals could not be excluded as having contributed to that DNA profile.

¶ 73    We find no error when the trial court permitted Ramos to testify about the testing he conducted and his conclusions. There is no Illinois authority to support the proposition that DNA evidence is excludable as a matter of law based on the evidence being too inconclusive. *People v. Mitchell*, 2011 IL App (1st) 083143, ¶ 35. This is true of DNA evidence conclusions based upon only four or six loci. *Id.*; *People v. Smith*, 2012 IL App (1st) 102354, ¶ 75. Furthermore, DNA probability calculations have long been generally accepted and admissible, and any challenge to their reliability usually goes only to the weight to be given to the evidence. *People v. Pike*, 2016 IL App (1st) 122626, ¶ 48.

- 16 -

¶ 74 The instant case involved a DNA sample containing a mixture interpreted as the DNA of two people. The DNA Advisory Board has endorsed two methods for calculating statistical ratios in cases of mixed DNA samples: (1) the combined probability of inclusion (or its reverse, the combined probability of exclusion) or (2) the likelihood ratio calculation. *Id.* ¶ 55. Ramos's testimony giving the probability of inclusion/exclusion regarding the mixture of DNA profiles on the watch and watch back was relevant where it corroborated the eyewitnesses' identifications that defendant shot the victim. See *id.* ¶ 71. Natasha, Kathleen, and Abdullah identified defendant as the individual who shot the victim, and Mayblelene identified defendant as the person she observed run from the scene of the shooting with a gun in his hand.

¶ 75 Defendant also asserts the State erroneously argued to the jury that the DNA affirmatively linked defendant to the crime scene when the prosecutor attempted to quantify Ramos's statistics with an analogy to the amount of people that could fit in the United Center and claimed that because only 1 in 670,000 black males could not be excluded as a contributor of the DNA profile collected from the watch and watch back, it was unlikely that anyone but defendant could be the shooter.

¶ 76 According to the record, the challenged argument of the prosecutor was as follows:

"The DNA. I want to put this in perspective. This is a chance of one in 670,000. Not one in fourteen. Not one in ten. One in 670,000. So let's put this in perspective. The United Center can fit and hold about 20,000 people. That's a big building for basketball games, hockey games, it's huge. Take the size of the United Center and multiply that not by one, not by two, but by about 33 sizes of the United Center. Fill that enormous space with 670,000 male blacks. You have a chance of picking one out of there that cannot be excluded from having their DNA on the watch. One. And what's the chance that that one person is [defendant]? What's the chance that that one person is who Natasha and Kathleen say, 'I saw him shoot [the victim] in cold blood?' What's the chance that one person is the same person who [Abdulla] said had a confrontation with [the victim]? What's the chance that one person is the same person who [Mayblelene] said, 'I saw him running from the scene right after the shots with what I believe to be [a] gun in his hand?' What's the chance that that DNA came back that he cannot be excluded? And he had on a purple hoodie and a purple tag was left right there on the crime scene.

You know [the victim] was out there because that's where he died. And he positively can be excluded. He can be excluded. It's not his DNA on the watch anywhere. Had he not been there, then no exclusion can happen. Had he [defendant] not been there, he should have been excluded."

At this point, the trial court sustained the defense's objection and instructed the jurors to disregard any misstatement of facts or law by the attorney and to use their own recollection of the evidence presented. The prosecutor continued:

"The defendant's DNA cannot be excluded and [the victim] can. What's the chance that it would go with everything the witnesses told you?"

¶ 77 Our review of the record establishes that the State's argument concerning the DNA evidence was neither inaccurate nor misleading. Contrary to defendant's implied argument, the State did not advance an argument that conflated the evidence concerning the probability of defendant's inclusion/exclusion with the probability that defendant was the source of the

DNA sample. The prosecutor's United Center analogy did not advance an argument about the probability that defendant in a crowd of 670,000 black males would be the single source of the DNA. See *id.* ¶¶ 61-63 (discussing the prosecutor's fallacy). The State did not argue that out of 670,000 black males, one individual would be a match to the DNA sample. The State simply attempted to give the jury a visual image of what 670,000 people would look like as they considered the evidence that 1 in 670,000 black males could be included as a contributor to the profile found on the watch and watch back.

¶ 78    As defendant's argument has no merit, we need not address the issue of whether his counsel was ineffective for failing to object to Ramos's testimony and the prosecutor's analogy during closing argument. Furthermore, the record refutes defendant's assertion that defense counsel failed to meaningfully challenge the reliability of the DNA evidence and statistical analysis. Defense counsel's extensive cross-examination of Ramos and closing argument emphasized the implications of the 6-loci limitation of the DNA evidence.

¶ 79                                                  D. Sentencing

¶ 80    First, defendant argues that the additional 45-year sentence imposed pursuant to the statutory firearm sentencing enhancement should be vacated because the statute is unconstitutionally vague where it provides no objective criteria upon which the trial court could rely when imposing a sentence and instead encourages an arbitrary and discriminatory enforcement of the law. This court has reviewed these very same arguments and determined that the 25 years to natural life sentence enhancement is not unconstitutionally vague. *People v. Sharp*, 2015 IL App (1st) 130438; *People v. Butler*, 2013 IL App (1st) 120923. We continue to follow *Sharp* and *Butler* and hold that the statutory firearm sentencing enhancement is not unconstitutionally vague.

¶ 81    Next, defendant argues the trial court abused its discretion by imposing an excessive sentence of 45-years' imprisonment for murder and an additional consecutive 45-year term because he personally discharged the firearm that cause the victim's death. A trial court maintains broad discretion in determining the appropriate sentence for a particular defendant, and its decision will not be reversed absent an abuse of discretion. *People v. Patterson*, 217 Ill. 2d 407, 448 (2005). If the sentence imposed is within the statutory range, it will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Fern*, 189 Ill. 2d 48, 54 (1999).

¶ 82    At sentencing, two members of the victim's family read victim impact statements, and the State presented certified copies of defendant's prior convictions for aggravated unlawful use of a weapon and armed robbery. The prosecutor argued that defendant caused "terror" and did not support his child, whose mother worked to pay the bills. The prosecutor asserted that defendant could not be rehabilitated and asked for a life sentence. For the defense, members of defendant's family testified that defendant was attending nursing school and had difficulty with the departure of his father, who had a drug problem and left when defendant was young. Defendant asked for mercy but maintained his innocence.

¶ 83    The trial judge stated that defendant thought of no one but himself, did not consider the devastation his actions would inflict on his family and the victim's family, and had no justification for his actions. The judge noted that defendant's criminal history from juvenile to the adult cases had "gotten progressively worse" from drugs, to gun use, to armed robbery,

and now murder. When defendant verbally protested, the judge noted that defendant's actions in court showed his lack of accountability, responsibility and respectability, his selfish nature, his lack of acknowledgment of his record, and his continued disregard for humanity.

¶ 84    The record clearly indicates the trial court properly considered the retributive and rehabilitative factors, seriousness of the offense, likelihood of restoring the defendant to useful citizenship, as well as mitigating evidence and testimony. The trial court's 45-year sentence for murder fell within the 20 to 60 year statutory sentencing range for which defendant was eligible. 730 ILCS 5/5-4.5-20 (West 2012). Further, the trial court's consecutive 45-year sentence based upon defendant personally discharging the firearm that killed the victim also fell within the 25 years to natural life statutory range for which he was eligible. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2012). We therefore conclude that the trial court properly imposed a sentence proportionate to the nature of the offense and that the factors considered did not render this sentence arbitrary.

¶ 85    Finally, defendant contends and the State agrees that the mittimus should be corrected to reflect a single conviction of murder and a 90-year term of imprisonment. We order the mittimus corrected to reflect one conviction of knowing and intentional first degree murder pursuant to section 9-1(a)(1) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(1) (West 2012)). *People v. Cardona*, 158 Ill. 2d 403, 411 (1994) (the most serious murder charge is upheld and sentence is imposed on that count).

¶ 86                                                III. CONCLUSION

¶ 87    For the foregoing reasons, we affirm the judgment of the trial court and direct the clerk of the circuit court to correct the mittimus to reflect one conviction of murder and a 90-year term of imprisonment.

¶ 88    Affirmed; mittimus corrected.

¶ 89    JUSTICE HALL specially concurring.

¶ 90    I agree with the majority's conclusion that the defendant failed to meet his burden of showing that the trial court's noncompliance with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) affected the fairness of his trial and challenged the integrity of the judicial process. However, I write separately because I believe the majority both misapprehended the relevant issue before our court and the applicable standard of review.

¶ 91    The majority determined that no abuse of discretion resulted from the trial court's conclusion that the *voir dire* of prospective juror L.L. demonstrated that she did not understand English and thus was competent to serve as a juror. The defendant asserts that he was denied his due process right to a fair and impartial jury when the trial court failed to conduct a Rule 431(b) inquiry into juror L.L.'s lack of understanding of the second *Zehr* principle. Since defendant's claim of error concerns the interpretation of a supreme court rule, the applicable standard of review is *de novo*, not abuse of discretion. See *People v. Suarez*, 224 Ill. 2d 37, 41-42 (2007); *People v. Wrencher*, 2011 IL App (4th) 080619, ¶¶ 36-37. Moreover, in regard to Rule 431(b), the primary issue on appeal was not whether prospective juror L.L. understood English or whether the trial court should have inquired into her understanding of the English language. The primary issue was whether the trial court

committed plain error under the second prong of plain error review by failing to inquire further after L.L. indicated she did not understand the second principle of Rule 431(b), that before a defendant can be convicted of a criminal offense, the prosecution must prove him or her guilty beyond a reasonable doubt. The prosecution must prove every element of the offense charged beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 361 (1970).

¶ 92    The majority does not point to any exchange in the record between L.L. and the trial court or defense counsel demonstrating that L.L.'s confusion about such a fundamental legal concept as proving a defendant guilty beyond a reasonable doubt was ever resolved or settled as required by Rule 431(b). The Rule "requires questioning on whether the potential jurors both understand and accept each of the enumerated principles." *People v. Thompson*, 238 Ill. 2d 598, 607 (2010).

¶ 93    The dissenting opinion in *Thompson*, authored by Justice Burke and joined by Justice Freeman, pointed out that the rationale for imposing this duty on trial courts is that only by asking these questions can any hidden biases that a potential juror might harbor be uncovered and that in the absence of such questions the defendant would be deprived of " 'his right to a fair and impartial jury.' " (Emphasis omitted.) *Thompson*, 238 Ill. 2d 598, 617 (Burke, J. dissenting, joined by Freeman, J.) (quoting *People v. Zehr*, 103 Ill. 2d 472, 477 (1984)). Like the supreme court in *Zehr* and the dissenting justices in *Thompson*, I believe it is vital to the selection of a fair and impartial jury that a juror who finds that the State has failed to sustain its burden of proof of guilt beyond a reasonable doubt have no prejudices against returning a verdict of not guilty. *Zehr*, 103 Ill. 2d at 477. I also agree that it is equally important that a juror who finds that the State has sustained its burden of proof have no prejudice against returning a verdict of guilty. *Id.* Understanding and acceptance of the second principle in Rule 431(b) helps ensure that both of these goals are accomplished.

¶ 94    Since the *Thompson* decision, the supreme court has rejected the conclusion that a failure to ask questions which are not only mandated by this court but which are "vital to the selection of a fair and impartial jury" necessarily amounts to plain error. (Internal quotation marks omitted.) *Thompson*, 238 Ill. 2d at 619. While I believe Justice Burke's dissenting opinion in *Thompson* states the better rule, I am compelled to follow the majority opinion in that case.