2021 IL App (1st) 19-0251-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
January 19, 2021

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois, |
| | ) | Criminal Division. |
| v. | ) | |
| | ) | No. 16 CR 8306 |
| CLAUDIOUS WILLIAMS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | The Honorable |
| | ) | Charles P. Burns |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Pucinski concurred in the judgment.

**ORDER**

¶ 1   *Held*: There was no plain error in the admission of a police officer's narration of surveillance video footage depicting the murder, and the defendant was not denied his constitutional right to effective representation of counsel where counsel failed to object to the admission of such evidence.

¶ 2   Following a jury trial in the circuit court of Cook county, the defendant, Claudious Williams, was found guilty of first-degree murder and sentenced to 50 years' imprisonment. On appeal, the defendant argues that the trial court erred when it permitted a police officer to narrate the

surveillance video footage of the shooting and to use that footage to identify him as the shooter. For the reasons that follow, we affirm.

¶ 3                                                  II.  BACKGROUND

¶ 4        In May 2016, the defendant was charged with six counts of first-degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2016)) for his involvement in the April 7, 2016, shooting of the victim, Marvin Lee, in front of Murphy's Lounge (Murphy's) at 7628 South Cottage Grove Avenue in Chicago.

¶ 5        On August 8, 2018, the defendant proceeded to a jury trial at which the following relevant evidence was adduced.  At the outset, the parties stipulated to the foundation for several video surveillance recordings of the shooting.  Specifically, the parties stipulated that the surveillance footage was captured from: (1) several cameras outside and inside of Murphy's; (2) one camera outside of the Empire Motel located at 7621 Cottage Grove Ave.; (3) two cameras outside of New Covenant Missionary Church, located at 754 East 77th Street; (4) one camera outside of the Odyssey Lounge located at 7643 South Cottage Grove Ave.; and (5) a dashboard camera from inside a passing police vehicle.  According to the stipulations, none of the video recordings had sound, and only the police vehicle footage was time-stamped correctly.

¶ 6        After the stipulations, the State presented testimony from two of the victim's friends, Travell Amicks and Stefhon Hannah, both of whom were with the victim on the night of the shooting.

¶ 7        Amicks first testified that on the evening of April 6, 2016, he met Hannah and the victim at a liquor store on the corner of 87th Street and the Dan Ryan Expressway. After spending about 30 to 40 minutes in the parking lot of the liquor store, the men proceeded to a cigar lounge in Hyde Park, after which they drove to Murphy's.  Amicks drove in his own car, while Hannah rode with the victim.

¶ 8        The three men arrived at Murphy's around 11:30 p.m.  While there, Amick's had a single shot of whiskey.  He stated that this was the only drink he had that evening and was therefore not drunk.

¶ 9        Amicks averred that while at Murphy's he noticed the defendant dancing in the crowd. Amicks had never seen the defendant before but noticed him because of his clothes. Specifically, the defendant was wearing "dark pants, a [short-sleeved] Lacoste shirt, Ferragamo belt and Jordan 5's." What struck Amicks most were the defendant's shoes, which had a reflective tongue and were shiny.  He further noted that the Ferragamo belt buckle was distinctive because of its shape and size.

¶ 10       At about 2 a.m., Amicks and the victim were about 10 to 15 feet away from the front door, leaning on the wall next to each other, while Hannah was standing behind the bar, and was drunk.  Murphy's was closing, and the security guards were ushering customers outside and yelling at them that "it was time to leave."  One of the security guards approached Amicks and asked him to tell Hannah to stop talking to people as they were leaving because he was "holding up people from getting out."

¶ 11       Amicks explained that Hannah, who was still behind the bar, had been speaking to Mikkel Glover, who was a very large man, and who was standing next to the front door.  After the security guard asked Hannah to stop talking to people, Hannah and a security guard got into a "verbal altercation" after which Glover went to Hannah's defense.  When the security guard started to approach Glover, Hannah jumped over the bar and went to the front door between Glover and the guard.  Amicks observed "some pushing and some shoving," and the guard attempting to move Hannah out the door.

¶ 12       At this point, the victim tried to separate Hannah and Glover from the security guard and

grabbed Hannah's arm. Hannah and the victim started to push and shove each other. Glover jumped in and the victim started to push him as well. Amicks tried to break up the fight but the pushing and shoving continued until the security guards pushed the whole group out of the lounge.

¶ 13    Once outside, Glover and the victim continued to push and shove each other. Amicks then heard Glover tell the victim, "you'll get killed." Amicks testified that he took Glover's threat "pretty serious[ly]" and that he was "alert" after that.

¶ 14    Amicks stated that the altercation eventually subsided when Hannah walked Glover across the street, while Amicks walked the victim back to his car and had him go inside. The victim's car was parked on the same side of the street as Murphy's facing south and with its headlights on. Hannah subsequently approached Amicks and they talked for a bit before Hannah went back into Murphy's to pick up his jacket and Amicks entered his own car.

¶ 15    While inside his car, Amicks heard Glover call out to the victim, "Hey, Marvin, let me holler at you," and saw Glover walking across the street. Amicks and the victim each got out of their cars. Amicks testified that Glover's hand was extended, so Amicks walked over to Glover and they shook hands. Amicks told Glover "whatever you need to talk to him about, like you can talk to him later, like when you all not, you know what I'm saying, like drunk." Glover told Amicks that he only wanted to apologize to the victim, so Amicks allowed him to pass. Glover then crossed the street and shook the victim's hand.

¶ 16    At that point, Amicks observed the defendant on Cottage Grove Avenue. Amicks testified that he recognized the defendant immediately because of his face and his clothes (particularly the shoes with the reflective tongues). Amicks averred that the defendant was wearing the same clothes he had been wearing inside Murphy's and that the only difference

about his appearance now was that he was also wearing a hoodie. As he approached, the defendant had both of his hands in the front pockets of his hoodie. The defendant walked over to Amicks and the two of them spoke for a few minutes. Amicks averred that he could see the defendant's face because the street was well lit, and the defendant was only about two feet away.

¶ 17    After their brief conversation, the defendant and Amicks approached Glover and the victim together. According to Amicks, Glover and the victim were "trying to come to some type of agreement" and their "hands were locked." At that point, another individual whom Amicks had seen inside Murphy's and whom he described as "Mop Top" because of his short dreadlocks (later identified as Akeem Foote-El) walked up to them and said, "Man, don't shake this n*****'s hand." Amicks then asked the defendant if he could "get [his] friend" because he was "making stuff escalate for no reason, like he's making it worse." The defendant responded, "forget him, they ain't know nothing, we gone." Foote-El then slapped the victim's and Glover's hands down and told Glover, "F**k these n****s…Kill the n****r." The defendant also told Glover, "f**k these n*****s, they ain't no sh*t. Let's go." At that point, Foote-El slapped the victim's and Glover's hands down a second time and punched the victim in the head. The victim stumbled back and tried to hit Foote-El but missed and fell to the ground. Amicks then hit Foote-El in the mouth and Foote-El fell.

¶ 18    As the victim got up from the ground, Amicks observed the defendant pull out a revolver from his pocket and fire at the victim. The victim's body "kind of jerked," and Amicks just "took off" running south. The defendant continued to shoot about four or five times. As Amicks ran, he turned back and saw the victim trying to run but falling in the middle of the street.

¶ 19    Amicks further testified that as he was running, he observed a second shooter standing next

to a clothes donation box across the street from Murphy's. Amicks had seen the second shooter inside of Murphy's earlier that evening and recognized him by the same letterman jacket he now wore. According to Amicks, the shots coming from the second shooter's gun sounded different from the shots fired by the defendant. Amicks stated that after the gunfire subsided, he saw the defendant and the second shooter fleeing the scene together. He acknowledged that the entire shooting lasted about two to three seconds.

¶ 20 Amicks remained at the scene and spoke to police. That day, he was shown photographs of a party from inside Murphy's from which he identified the defendant as the "first shooter" and the person who shot the victim. The following day, at the police station, he again identified the defendant as the shooter from a photo array.

¶ 21 During Amicks' testimony, the State next published the video surveillance footage to the jury and had Amicks describe what was being portrayed. In addition, Amicks identified the individuals shown on the footage including, himself, Hannah, Glover, Foote-El, the unidentified "second shooter," and the defendant.

¶ 22 In particular, Amicks first narrated footage from inside and outside of Murphy's. Specifically, Amicks testified that the recording from inside Murphy's showed the defendant enter the bar with the second shooter (who was wearing a letterman jacket) and arriving at the bar in the same group. The video footage also showed that after the second shooter left Murphy's, he returned and waited outside of the doorway with what appeared to be a gun in his waistband.

¶ 23 With respect to the video footage from the Empire Motel, Amicks stated that it showed the

6

defendant outside wearing the same shoes with reflective tongues that he had been wearing earlier inside Murphy's. This video also showed the defendant associating with Glover, Foote-El, and the second shooter outside of Murphy's.

¶ 24    The video from New Covenant Missionary Church captured the shooting but it did not play continuously and did not "capture everything." Amicks acknowledged that the footage "skips" during the shooting and is too blurry to decipher faces but nonetheless narrated what was happening in the footage based on his personal knowledge of what transpired that night.

¶ 25    On cross-examination, Amicks admitted that he had a 2015 felony conviction for identity theft. He also acknowledged that during his grand jury testimony he had stated that on the night of the shooting he drank "two shots" of liquor instead of one.

¶ 26    On cross-examination, Amicks also acknowledged that he did not see the defendant leaving Murphy's and did not know what time he left. He admitted that the defendant was not wearing a hoodie inside Murphy's and that the video surveillance footage did not show him carrying a hoodie when he entered or left the bar.

¶ 27    Amicks further acknowledged that he spoke to the defendant for only a minute before the shooting began. He reiterated, however that this was "long enough" for him to see the defendant because the street was illuminated with lamps and the defendant was not more than two feet away.

¶ 28    The State next called Hannah, who testified consistently with Amicks. Specifically, Hannah averred that on April 6, 2016, he had just returned to Chicago after playing professional basketball in Poland. Because he had just played a long season, Hannah wanted to relax, so together with Amicks and the victim, he proceeded to Murphy's, where he knew the owner and a bartender. Hannah spent the evening drinking heavily.

¶ 29     As the bar was closing, Hannah, who was behind the bar, noticed that the security guards were pushing patrons outside and telling them that they needed to leave. Amicks and the victim were on the other side of the bar, so Hannah told the owner to leave them alone. One of the security guards ignored Hannah and continued to push people out, so Hannah jumped over the bar and stood between him and his friends. According to Hannah, at that point, "everybody started pushing and grabbing." During the altercation, the victim grabbed Hannah, but Hannah was able to get away. Glover then grabbed the victim and told him, "Man he good," after which Glover and the victim began to argue.

¶ 30     Hannah testified that as they all walked out of the bar, Glover and the victim continued to bicker. Hannah grabbed Glover and told him to "chill," because the victim was "his brother." Amicks then walked the victim to his car, while Hannah remained with Glover trying to calm him down. Afterwards, Hannah walked over to Amicks and the victim and then proceeded to Murphy's to pick up his jacket.

¶ 31     While inside Murphy's, Hannah was talking to the owner when he heard gunshots. As soon as the shots stopped, Hannah ran outside. He heard Amicks screaming and saw the victim lying on the ground. Hannah averred that he did not see anyone else in the vicinity because he was solely focused on the victim.

¶ 32     Chicago Police Detective Wade Golab, who was assigned to investigate the homicide, next testified that he arrived at the scene at about 2:55 a.m. on April 7, 2016. After speaking with Amicks and Hannah, and learning that two shooters had been involved, Detective Golab proceeded along Cottage Grove Avenue noting the surveillance cameras at New Covenant Church, Murphy's, the Empire Motel and Odyssey Lounge. The detective obtained and reviewed all the video surveillance footage from these cameras.

¶ 33    As a result, Detective Golab learned that on the evening in question there had been a professional photographer taking photographs of a party inside of Murphy's. The detective obtained the photographs from the owner and showed them to Amicks, who used them to identify the defendant as the shooter. Detective Golab then watched a total of 10 hours of video surveillance footage with Amicks, who identified everyone for him.

¶ 34    During Detective Golab's testimony, the State again published the video surveillance footage from each of the cameras, and the Detective Golab narrated the footage, identifying all the actors, including the defendant. From the footage, Detective Golab identified the defendant several times inside and outside of Murphy's. He showed the jury what he described as a flash of light from the defendant's belt buckle and the reflective tongues on the defendant's shoes on recordings from inside and outside the bar. Detective Golab also testified that the videos showed the defendant arriving and leaving Murphy's with a group of people which included the second shooter. In addition, the detective identified the defendant as the shooter. Finally, Detective Golab explained that his conclusions and identifications from the videos were based on what Amicks told him, and from having watched the videos himself multiple times.

¶ 35    On cross-examination, the detective admitted that the recordings taken "outside," including the recording of the shooting, were too blurry to "see anyone's face."

¶ 36    At trial, the State next offered evidence from several police officers, forensic technicians, and the medical examiner. Summarized this testimony revealed the following. The victim was shot six times in the head and the body and died as a result of the gunshot wounds. The bullets and bullet fragments recovered from his body were 38-caliber bullets, which were fired from the same firearm. Five fired casings were recovered from a parking lot at 7641 South Cottage Grove Ave., and they were determined to have been fired from the same semi-automatic gun. The

casings were found near a blue clothes-donation box in the same area where Amicks had testified the second shooter was standing. A gun was never recovered from either the defendant or the scene of the crime and the police was never able to identify or apprehend the second shooter.

¶ 37     After the State rested, the defense presented no evidence. The parties proceeded with closing arguments. After deliberations, the jury found the defendant guilty of first-degree murder. In doing so, the jury also found beyond a reasonable doubt that the defendant had personally discharged the firearm that proximately caused the victim's death. The defendant was subsequently sentenced to 50 years' imprisonment (25 years on the murder conviction plus an additional 25 for the firearm enhancement). The defendant now appeals.

¶ 38                               II.  ANALYSIS

¶ 39     On appeal, the defendant solely contends that the trial court erred when it permitted Detective Golab to narrate the surveillance video footage as it was played to the jury because it constituted inadmissible lay witness identification testimony. The State initially notes, and the defendant concedes, that he has forfeited this issue for purposes of appeal by failing to properly preserve it for review. See *People v. Sebby,* 2017 IL 119445, ¶ 48. (To preserve an issue for purposes of appeal, the defendant was required to make a contemporaneous objection at trial and to raise the issue in a posttrial motion). The defendant nevertheless asks this court to review his claim under the plain error doctrine (Ill. S. Ct. R. 615(a) (eff. Jan.1, 1967); *People v. Herron,* 215 Ill. 2d 167, 186–87 (2005)), or alternatively, under an ineffective assistance of counsel claim. We address each contention in turn.

¶ 40                               A.  Plain Error

¶ 41     Beginning with plain error, we note that the plain error doctrine is a narrow and limited

exception to the general rule of forfeiture (*People v. Bowman,* 2012 IL App (1st) 102010, ¶ 29 (citing *Herron,* 215 Ill. 2d at 177)), which "allows a reviewing court to consider unpreserved error when: (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error; or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski,* 225 Ill. 2d 551, 565 (2007) (citing *Herron,* 215 Ill. 2d at 186–87). Under either prong of the plain error doctrine, the burden of persuasion remains on the defendant. *Bowman,* 2012 IL App (1st) 102010, ¶ 29 (citing *People v. Lewis,* 234 Ill. 2d 32, 43 (2009)).

¶ 42 "The first step of plain-error review is to determine whether any error occurred." *Lewis,* 234 Ill. 2d at 43; see also *People v. Wilson,* 404 Ill. App. 3d 244, 247 (2010) ("There can be no plain error if there was no error at all."). This requires "a substantive look" at the issue raised. *People v. Johnson,* 208 Ill.2d 53, 64 (2003). We will therefore first review the defendant's claim to determine if there was any error before considering it under plain error.

¶ 43 In *People v. Thompson*, 2016 IL 118667, ¶ 50, our supreme court held that lay witness identification testimony is admissible if "(a) the testimony was rationally based on the perception of the witness and (b) the testimony is helpful to a clear understanding of the witness's testimony or a determination of a fact in issue." Such "testimony is helpful where there is some basis for concluding the witness is more likely to correctly identify the defendant from the surveillance recording than the jury." *Id*. A showing of sustained contact, intimate familiarity, or special knowledge of the defendant is not required. *Id*. Instead, "the witness must only have had contact

with the defendant, that the jury would not possess, to achieve a level of familiarity that renders the opinion helpful." *Id.*

¶ 44     To determine whether the testimony is helpful, courts view the totality of the circumstances and consider:

 "the witness's general familiarity with the defendant; the witnesses' familiarity with the defendant at the time the recording was made or where the witness observed the defendant dressed in a manner similar to the individual depicted in the recording; whether the defendant was disguised in the recording or changed his/her appearance between the time of the recording and trial; and the clarity of the recording and extent to which the individual is depicted."

The absence of any particular factor, however, does not render the testimony inadmissible." *Id.* ¶ 51.  In addition, "the extent of a witness's opportunity to observe the defendant goes to the weight of the testimony, not its admissibility." *Id.* ¶53.  However, even admissible evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." (Internal quotation marks omitted.) *Id.* ¶ 54.

¶ 45     What is more, in the context of lay opinion identification testimony offered by a law enforcement officer, such as the one challenged here, in *Thompson*, our supreme court held that prior to its admission, the trial court "should afford the defendant an opportunity to examine the officer outside the presence of the jury" and "properly instruct the jury," both before the testimony is offered and in its "final charge to the jury," that the jury "need not give any weight at all to such testimony" and may not "draw any adverse inference from the fact the witness is a law enforcement officer if that fact is disclosed." *Id.* ¶ 59. These precautionary procedures are intended to safeguard the defendant's right to cross-examine the officer concerning his familiarity

with the defendant and disclose any bias or prejudice without revealing to the jury the defendant's prior criminal record. *Id*. ¶¶ 57-59.

¶ 46     The trial court's decision to admit lay opinion identification testimony is reviewed for an abuse of discretion. *Id*. ¶ 52. Such an abuse occurs when the trial court's ruling is fanciful, unreasonable, or when no reasonable person would adopt the trial court's view. *People v. Taylor,* 2011 IL 110067, ¶ 27.

¶ 47     In the present case, after a review of the record, we find that the trial court abused its discretion in admitting Detective Golab's testimony regarding the contents of the surveillance footage. While the detective's narration of the surveillance footage was helpful to a certain extent because of the blurriness of the video footage, particularly the recordings of the actual shooting, the record unequivocally reveals that apart from Amick's identification of the defendant as the shooter from the footage, the professional photographs, and the photo array, Detective Golab had no familiarity whatsoever with the defendant or any of the other individuals depicted in the surveillance footage either before or after the shooting, so as to make it more likely for him, rather than the jury, to correctly identify those individuals from the surveillance footage. Furthermore, the detective's identification testimony was offered without the trial court first engaging in any precautionary procedures to safeguard the defendant's right to confrontation. *Thompson*, 2016 IL 118667, ¶¶ 57-59 (the trial court erred in admitting the identification testimony of law enforcement officers without first engaging in precautionary measures). Under these circumstances, we are compelled to conclude that the admission of Detective Golab's identification testimony was made in error. See *e.g*., *People v. Brown*, 2017 IL App (1st) 142197, ¶ 56 (holding that a police officer's testimony identifying the defendant from a video recording was inadmissible where the record did not indicate the officer had any

familiarity with the defendant beyond eyewitness statements that the defendant was the shooter, eyewitness descriptions of what the shooter wore, and a photograph of the defendant from police computer files); *Thompson*, 2016 IL 118667, ¶ 63 (holding that a police officer's testimony identifying the defendant in a recording inadmissible where there was "no testimony as to how long he had known defendant, how many times he had seen defendant, and under what conditions or circumstances he had seen defendant.").

¶ 48    Nevertheless, for the following reasons, we find that any error in the admission of the aforesaid lay opinion identification testimony did not rise to the level of plain error.

¶ 49    With respect to the first prong, contrary to the defendant's position, the record reveals that the evidence presented at trial was far from closely balanced but rather overwhelmingly established the defendant's guilt. It is axiomatic that the testimony of a single eyewitness, if positive and credible, is sufficient to sustain a conviction. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). The evidence here unequivocally established that Amicks observed the entire shooting from close-up and identified the defendant as the shooter. Immediately prior to the shooting, Amicks heard the defendant threaten the victim, stating, "f**k these n*****s, they ain't no shit." Amicks then saw the defendant pull a revolver from the pocket of his hoodie, raise that revolver, and shoot the victim multiple times. In addition, Amicks testified that a second shooter, who was standing across the street by a parking lot, fired additional shots at the victim from his own gun. After the shooting, Amicks saw the defendant and the unidentified second shooter flee the scene together.

¶ 50    What is more, the evidence at trial uncontrovertibly established that Amicks had ample opportunity to observe the defendant prior to the shooting. Amicks first noticed the defendant inside Murphy's because of his dancing and distinctive clothing, particularly his belt buckle and

the shoes with the reflective tongues.  Once Glover threatened the victim outside of Murphy's Amicks testified that he was on "alert."  When he subsequently saw the defendant approaching him outside of Murphy's, Amicks immediately recognized him because of his face and clothing and noted that he now also wore a hoodie.  Amicks then proceeded to have a several-minute long conversation with the defendant before they approached Glover and the victim together and the altercation resumed, ultimately resulting in the defendant shooting the victim.  Throughout this time, the street was well lit with lamps, and the defendant stood only a couple of feet away from Amicks.  After the shooting, Amicks remained at the scene and spoke to police, after which within a matter of hours, he identified the defendant as the shooter.

¶ 51     Under this record, we are compelled to conclude that any error in the admission of Detective Golab's narration of the surveillance video footage was harmless in light of the overwhelming evidence of the defendant's guilt.  See e.g., *Brown*, 2017 IL App (1st) 142197, ¶ 65 (holding that while it was error to admit the lay opinion identification testimony of a police officer any prejudice that could have stemmed from that erroneous admission was not so severe to have prejudiced the outcome of the defendant's trial).

¶ 52     We similarly reject the defendant's contention that he should be permitted to proceed with his claim under the second prong of plain error doctrine.  Our courts have repeatedly held that second-prong plain errors are akin (although not limited) to structural errors, *i.e.*, systemic errors which serve to erode the integrity of the judicial process and undermine the fairness of the defendant's trial. *People v. Clark*, 2016 IL 118845, ¶ 46*; People v. Thompson*, 238 Ill. 2d 598, 608-609, 613 (2010). Such errors render "a criminal trial fundamentally unfair or an unreliable means of determining guilt or innocence." *Id.* at 609. Examples of structural errors include: the complete denial of counsel, trial before a biased judge, racial discrimination in the selection of a

grand jury, denial of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction. *Id.*; see also *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149-150 (2006); *Johnson v. United States*, 520 U.S. 461, 468 (1997).

¶ 53     The reason behind the correlation between second-prong plain error and structural error analysis is that neither requires consideration of the strength of the trial evidence.  In other words, these types of errors are automatically reversible, even in the most overwhelmingly strong cases.  Contrary to the defendant's position, by their very nature evidentiary errors, as the one alleged here, must be reviewed in balance with the strength of the evidence (*People v. E.H.*, 224 Ill. 2d 172, 180-81 (2006); *People v. Nevitt*, 135 Ill. 2d 423, 447 (1990)).  As such, they do not fall into the category of systemic errors that erode the integrity of the judicial system. Since the defendant points to no case law to the contrary, we hold that the evidentiary error here was not so serious that it affected the fairness of the defendant's trial and challenged the integrity of his judicial process.  Accordingly, we conclude that the defendant has failed in his burden to establish second-prong plain error.

¶ 54                              B.  Ineffective Assistance of Counsel

¶ 55     The defendant nonetheless contends that if his claim cannot be reviewed under the plain error doctrine, we should review it under the auspices of an ineffective assistance of counsel claim.  In this respect, he argues that counsel's failure to object to Detective Golab's narration of the video surveillance footage deprived him of his constitutional right to competent representation.  For the following reasons, we disagree.

¶ 56     Claims of ineffective assistance of counsel are resolved under the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *Brown*, 2017 IL App (1st) 142197, ¶ 46; see also *People v. Lacy*, 407 Ill. App. 3d 442, 456 (2011); see also *People v. Colon*, 225 Ill.

2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*)).

Under *Strickland*, the petitioner must establish both: (1) that his counsel's conduct was deficient, *i.e.,* fell below an objective standard of reasonableness; and (2) that he was prejudiced as a result of that conduct. See *Lacy*, 407 Ill. App. 3d at 456; *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007) (citing *Strickland*, 466 U.S. at 687-94)). It is the defendant's burden to satisfy both prongs of *Strickland* and failure to satisfy either precludes a finding of ineffectiveness. *People v. Simpson*, 2015 IL 116512, ¶ 35; see also *People v. Bannister*, 232 Ill. 2d 52, 80 (2008).

¶ 57 For the reasons already articulated above in the context of first-prong plain error review, namely the overwhelming nature of the evidence presented against the defendant we find that the defendant was not prejudiced by counsel's failure to object to Detective Golab's narration of the surveillance footage, so as to be able to proceed on his ineffective assistance of counsel claim. See *Brown*, 2017 IL App (1st) 142197, ¶ 66 (holding that the defendant could not establish prejudice in counsel's failure to object to the police officer's narration of video recordings where the evidence against the defendant was overwhelming and other witnesses could identify the defendant from that same footage).

¶ 58 In this respect, we note that our supreme court has held:

"Plain-error review under the closely-balanced-evidence prong of plain error is similar to an analysis for ineffective assistance of counsel based on evidentiary error insofar as a defendant in either case must show he was prejudiced: that the evidence is so closely balanced that the alleged error alone would tip the scales of justice against him, *i.e.,* that the verdict 'may have resulted from the error and not the evidence' properly adduced at trial (see *People v. Herron,* 215 Ill.2d 167, 178 (2005) (plain error)); or that there was a 'reasonable

probability' of a different result had the evidence in question been excluded (see *Strickland,* 466 U.S. at 694, 104 S. Ct. 2052)." *People v. White,* 2011 IL 109689 ¶ 132.

¶ 59                                    III.  CONCLUSION

¶ 60      Accordingly, for all the aforementioned reasons, we affirm the judgment of the circuit court.

¶ 61      Affirmed.