2025 IL App (1st) 231438-U

Fourth Division
Filed May 15, 2025

No. 1-23-1438

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | Appeal from the |
|    Plaintiff-Appellee, | Circuit Court of Cook County |
|   v. | No. 2018 CR 03182 01 |
| JEROME MOORE, | The Honorable Timothy Joseph Joyce, |
|    Defendant-Appellant. | Judge, presiding. |

JUSTICE OCASIO delivered the judgment of the court.
Presiding Justice Rochford and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1     *Held*: (1) The trial court did not abuse its discretion by permitting a police detective to describe what was shown in security footage that was played for the jury or to offer his opinion that certain footage depicted the suspected shooter. (2) The trial court cured any prejudice from the detective's improper identification of defendant as the suspected shooter by timely sustaining the defense's objection. (3) Any error in permitting a family friend who had not seen defendant since he was a teenager to identify him on the footage was harmless.

¶ 2     A jury found Jerome Moore guilty of murdering Deonte Thomas and attempting to murder Thomas's two companions, Ayana Morris and Ryan Edwards-Cunningham. On appeal from his convictions, Moore argues that he is entitled to a new trial because the court allowed the State to present inadmissible and prejudicial lay opinion testimony under Illinois Rule of Evidence 701 (eff. Jan. 1, 2011). We affirm.

¶ 3                                    BACKGROUND

¶ 4        The circumstances that led to the death of Deonte Thomas arose on Saturday, January 20, 2018. Ryan Edwards-Cunningham, Ayana Morris, and Deonte Thomas were planning on meeting and going to lunch. The three of them were going to meet another friend, Poppy, at the 69th Street Red Line station before going to eat at a Caribbean restaurant. Ryan parked at a McDonald's across the street from the station to change from her work clothes to her street clothes while Ayana and Deonte went to the station to wait for Poppy. They took up a spot next to a bus turnaround.

¶ 5        While Ayana and Deonte were waiting, a man approached them and offered them 30 cents to buy a loose cigarette. They told him they did not have any. A short time later, the same man came back, this time offering 50 cents for a loose cigarette. They repeated that they did not have any loose cigarettes to sell him, and they suggested that he ask a group of men down the sidewalk. One of those men, who was wearing blue jeans, a gray jacket or hoodie, and a black skull cap, approached them. He told them that they could not stand there, and he directed them to "move around from the bus station." They moved away from the man's group, but they did not leave the bus turnaround. After Ryan joined Ayana and Deonte, the man with the gray jacket returned and asked, "[D]idn't I tell you all to move from here?" Trying to avoid further confrontation, Deonte replied, "[M]an, I ain't know nothing." The man responded by reaching into his pocket, pulling out a silver gun, and starting to shoot. Reflexively, Deonte, Ayana, and Ryan ran away from the shooter. At trial, Ayana testified to hearing seven to nine shots and the shots were directed at her, Ryan, and Deonte. Ryan testified hearing "too many [shots] to count." Deonte Thomas was shot and killed.

¶ 6        As part of their investigation, police obtained security footage captured by a nearby police observation device (POD camera) that showed the bus turnaround, cameras mounted on three different CTA buses, including one that was parked at the turnaround when the shooting took place, cameras from inside the train station, and cameras from the nearby McDonald's. The parties stipulated to the admission of the footage. The footage played at trial depicted three locations: the bus turnaround, the interior of the train station, and the McDonald's. The turnaround was covered

by several different cameras. A POD camera situated at the west end of the turnaround gave an overview of the scene, although the sidewalk was frequently obscured by buses that were using the turnaround. The sidewalk was also depicted by two cameras mounted on one such bus and by a camera attached to the station's exterior. A camera mounted above the fare box on the bus showed the intersection beyond the west end of the bus turnaround, and one camera captured the interior of the train station. Finally, two cameras showed the interior of the McDonald's.

¶ 7    Chicago police detective William Levigne testified about the videos at length. He briefly explained where the videos had come from, and he testified that he had reviewed them himself. Levigne then went through each of the videos and described what they showed that had "investigative value." The first video shown during his testimony was footage from the bus that was parked only feet away when the shooting took place. Initially, Levigne identified a person seen in that footage as "who we now know to be Defendant Jerome Moore," but the defense promptly objected, and the court sustained the objection. Thereafter, Levigne identified that individual only as the suspect or the subject, not as Moore. (Three times during the ensuing testimony, the prosecutor referred to the subject as "defendant," but the court sustained an objection to the first and admonished him to use a different term after the second, and the prosecutor corrected himself the third time.) For clarity's sake, we will describe what the video showed chronologically, not in the order that it was presented at trial.

¶ 8    The first relevant sequence took place about two hours before the shooting at the McDonald's. At 11:06 a.m., a man whom Levigne identified as the suspect entered the restaurant. The security footage depicts him as heavyset and wearing a gray jacket with a red shirt peeking out from underneath it, blue jeans, dark shoes, and a black winter hat with red and white stripes bearing what appears to be the logo for the Chicago Blackhawks. He was also carrying a blue bag with a cross-body strap. The suspect ordered food from the counter and then joined an unidentified woman at a table, where they both ate. They stood up and walked out together at 11:38 a.m.

¶ 9    The second relevant sequence occurred minutes before the shooting. At 12:57 p.m., the POD camera captured Ryan and Deonte entering the turnaround from the west end and walking down

the sidewalk before stopping and standing near the entrance to the train station. At 12:58 p.m., the same camera captured several people, including a person whom Levigne identified as the suspect, coming out of the train station. That person appeared to be wearing a gray hooded jacket and dark jeans, but his distance from the POD camera makes it impossible to discern any additional details. The suspect lingered near the entrance with the others who had exited the station. Just before 1:03 p.m., the suspect entered the station. At that same time, a camera inside the station showed a man, whom Levigne identified as the suspect, walking inside. His attire was the same as the person shown in the McDonald's security footage: a gray hooded jacket, a red shirt with white writing visible through the now-open jacket, blue jeans, dark shoes, and a black cap with red-and-white stripes. Fifteen seconds later, he exits the station, going out of the interior camera's view. At that same moment, the POD camera captured the once-again-indistinct suspect emerging from the station. Less than a minute later, just before 1:04 p.m., both the POD camera and the station interior camera captured the suspect re-entering the station. The footage from inside the station showed him walking directly to the other side of the building, which abutted 69th Street, and is out of view. Seconds later, he—or, at least, someone fitting his rough description—came into view of the POD camera walking westbound on the sidewalk alongside 69th Street, toward the McDonald's, before breaking into a jog and crossing the street (and out of the camera's sight).

¶ 10      The third and final sequence started five minutes later. At 1:09 p.m., the train station's exterior camera captured Ryan joining Ayana and Deonte. They stood on the sidewalk socializing. Meanwhile, at 1:10 p.m., a man matching the suspect's appearance—a heavyset man wearing a gray hooded jacket, a red shirt, blue jeans, dark shoes, and a black winter hat with red and white stripes and what appears to be a Blackhawks logo—entered the McDonald's. Although his jacket was now zipped and he was not carrying a bag, Levigne identified him as the same person as in the earlier footage. He was in the McDonald's for nearly exactly one minute before leaving. Seconds later,[1] the suspect was captured by the POD camera and cameras on a parked bus crossing

---

[1]    It is not clear precisely how long. Because there is overlap between what is shown on the POD, bus, and station footage, it is readily deduced that the clocks used by the POD camera and the station cameras

Lafayette Avenue and entering the turnaround walking westbound on the sidewalk. As he passed the bus, he put his hood up over his hat. Just after walking past a group of people including Ryan—whose all-white outfit makes her easy to pick out from the others—he stopped. Less than two minutes later, he drew a gun and fired at least one shot. As Ayana, Ryan, and Deonte sprinted westbound, the shooter followed, firing twice more before breaking into a trot and putting his gun hand into his jacket pocket. As Ayana and Deonte ran past the front of the bus, they both fell to the ground. Deonte got his legs beneath him and kept running, trying to cross Lafayette Avenue, but he took only four steps before falling chest-first into the pavement. He stopped moving. The shooter—his gun and left hand still in his pocket—ran past him and across the street.

¶ 11     At trial, the State elicited additional identification testimony from several witnesses. The evidence showed that, during the investigation of the shooting, Ayana and Ryan independently viewed six-person photo arrays at the police station. Ayana identified Moore as the shooter, and she repeated that identification at trial. Ryan identified a filler, and she did not identify anybody as the shooter at trial. Portions of the security footage were played during their respective examinations at trial. They identified themselves, Deonte, and the shooter in the footage shown to them, and they testified generally about what the video was showing them doing at various points.

¶ 12     The State's remaining witnesses on identity did not themselves witness the shooting. Instead, they testified to their opinions that the suspect, as depicted in still frames drawn from the security footage, was Moore. One of those witnesses was Kelly Fields, who had once lived with Moore and his mother and had accompanied Moore's mother to the police station during the investigation. Before her testimony, the court held a brief hearing under *People v. Thompson*, 2016 IL 118667, to determine whether her identification opinion would be admissible. At the hearing, Fields acknowledged that she had last lived with Moore in 1997—more than 20 years before the shooting—and that she had not seen Moore since he was 13 or 14 years old. Despite that long gap,

___

were roughly in sync and that the bus cameras' clock was about 20 seconds slow than those, but there appears to be no overlap in the footage from the McDonald's security cameras.

the trial court denied the defense's objection and allowed her to testify. Ultimately, Fields identified Moore in stills taken from the station footage, the McDonald's footage, and the bus footage. She acknowledged that, when she first viewed the stills about two weeks after the shooting, she had told the police that she was "not sure" that Moore was the person shown in one of the stills that had been taken from the bus footage. As during the *Thompson* hearing, she testified about how much time had passed since she had last lived with and seen Moore.

¶ 13　　Three other witnesses identified Moore from security stills. A security guard who worked at McDonald's testified that Moore, whom he recognized as a regular customer, was the person depicted in three stills from the McDonald's footage. A police officer who had detained Moore five days before the shooting for walking between cars on a moving train testified that he recognized Moore on a pair of bulletins distributed ten days after the shooting. One of the bulletins had a mug shot of Moore, but the other contained four stills taken from the bus footage. And immediately after Fields testified, Moore's mother, Rochelle Blue, testified that Moore was the person seen in stills taken from the McDonald's footage, the station footage, and the bus footage.

¶ 14　　Moore was found guilty of all counts: first degree murder of Deonte Thomas; attempted first degree murder of Ryan Edwards-Cunningham; and attempted first degree murder of Ayana Morris. On July 17, 2023, a motion for a new trial was heard and denied. Sentencing followed immediately and the court proceeded to impose a 50-year sentence for the first-degree murder conviction consecutive to concurrent sentences of 28 years for the two attempted-murder convictions, for an aggregate term of 78 years in prison.

¶ 15　　　　　　　　　　　　　　　ANALYSIS

¶ 16　　Moore argues that the trial court erred by admitting Detective Levigne's lay opinion testimony about what was shown on the security footage played for the jury and by allowing Kelly Fields to opine that the person depicted in the security footage was Moore. Illinois Rule of Evidence 701 (eff. Jan. 1, 2011) permits lay witnesses to testify "in the form of opinions or inferences" so long as three criteria are satisfied. First, the lay opinion testimony must be "rationally based upon the

perception of the witness." Ill. R. Evid. 701(a) (eff. Jan. 1, 2011). Second, the testimony must be "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Ill. R. Evid. 701(b) (eff. Jan. 1, 2011). And third, the testimony must "not [be] based on scientific, technical, or other specialized knowledge within the scope of Rule 702," which governs expert testimony. Ill. R. Evid. 701(c) (eff. Jan. 1, 2011). Additionally, like any other otherwise admissible evidence, the trial court has discretion to exclude it if its probative value is substantially outweighed by some other concern, such as unfair prejudice. Ill. R. Evid. 403 (eff. Jan. 1, 2011). We review the trial court's decision to admit this testimony for an abuse of discretion. *People v. Thompson*, 2016 IL 118667, ¶ 49. An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it. *People v. McGath*, 2017 IL App (4th) 150608 ¶ 55.

¶ 17                                Detective Levigne's Commentary on Security Video

¶ 18         Moore first challenges the trial court's decision to allow Detective Levigne to offer his opinions about matters depicted in various security footage shown to the jury. Generally, he argues that it was improper for Levigne to narrate the footage by offering his impressions of what was going on in the video even though he was not a witness to the underlying events themselves. More specifically, he contends that the trial court should have sustained his objection to Levigne's testimony opining that the person depicted on one video performing the charged shooting was the same person seen in other videos played for the jury.

¶ 19         Initially, citing *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 30, Moore contends that the propriety of a witness drawing conclusions about what a video shows when the witness lacks personal knowledge of the underlying events is a legal question that is reviewed *de novo*. To the extent that is true, *de novo* review applies only to the limited legal question of whether that scenario falls entirely outside the scope of Rule 701. Put differently, we review *de novo* whether such testimony is inadmissible as a matter of law. And the answer to that question is quite clearly *no*. Countless cases—including cases cited by Moore—have found no error in the admission of lay

opinion testimony about what is depicted in a video even though the witness offering that opinion did not have personal knowledge of the underlying events. *E.g. People v. Brown*, 2017 IL App (1st) 142197, ¶ 62; *People v. Mister*, 2016 IL App (4th) 130180-B, ¶¶ 75-79. We agree that such testimony is not inadmissible as a matter of law.

¶ 20        With that clarification, the question becomes whether the criteria for admission under Rule 701 were satisfied in this case. We review that question deferentially, reversing only if the trial court's decision to admit the testimony was an abuse of discretion. *Mister*, 2016 IL App (4th) 130180-B, ¶¶ 73-74 (citing *Thompson*, 2016 IL 118667, ¶ 53). There is no dispute that Levigne's testimony was not based on specialized knowledge requiring him to first be qualified as an expert. See Ill. R. Evid. 701(c) (eff. Jan. 1, 2011). We therefore focus on the trial court's determinations that Levigne's lay opinion testimony was based on his own perceptions and helpful to the jury. See Ill. R. Evid. 701(a), (b) (eff. Jan. 1, 2011).

¶ 21        We find *Mister* instructive. There, a college student visited a casino in Peoria, where he won $23,000 at the craps tables before driving back to Champaign. *Id.* ¶¶ 6-8. As he got out of his car, he was accosted by an armed stranger who demanded the winnings. *Id.* ¶ 8. After the robbery, a casino employee went through security footage taken during the student's visit and determined that a patron named John Williamson had followed the student's group out of the casino. *Id.* ¶ 18. After learning that Williamson did not match the description of the robber, the casino employee went back to the footage and determined that Williamson had been accompanied by somebody who did—the defendant—for a substantial amount of time and that they had left the property together in a silver Pontiac Bonneville. *Id.* ¶¶ 19, 27. At trial, the casino employee testified extensively about what the security footage showed, including that he was able to keep track of the two suspects' movements inside the casino by their clothing, gait, and transitions from one camera to the next. *Id.* ¶¶ 15-28.

¶ 22        After his conviction for armed robbery, the defendant argued on appeal that the casino employee's testimony about the footage was improper because the employee lacked personal knowledge of the events depicted in the video and because his testimony invaded the province of

the jury. *Id.* ¶ 47. The court rejected that argument and affirmed. *Id.* ¶ 79. The casino employee might not have had personal knowledge of the events on the floor that night, the court explained, but he knew what was on the video because he had watched it. *Id.* ¶ 76. More than that, his repeated viewings of the video had given him the ability to understand what he was seeing and how it fit together, which helped the trier of fact understand what about the footage—which was introduced as evidence—was significant without forcing twelve jurors to perform that same time-consuming task. *Id.* ¶¶ 76-77. Finally, the trier of fact remained free to afford the casino employee's opinions whatever weight it felt was appropriate, and cross-examination gave the defendant ample opportunity to highlight deficiencies in that opinion. *Id.* ¶ 78. Its admission, accordingly, was not an error. *Id.* ¶ 79.

¶ 23    *People v. Brown*, 2017 IL App (1st) 142197, came to the same conclusion. There, as in this case, a police detective narrated security footage by drawing the jury's attention to particular individuals and describing those people's movements and actions as they were shown in the footage. *Id.* ¶¶ 18-19. As in *Mister*, the court held that this testimony was properly admitted under Rule 701. It held that, although the detective did not have first-hand knowledge of the underlying events, he had watched the footage and, therefore, was competent to testify about what the video showed. *Id.* ¶ 62. The court noted that the footage depicted "numerous people" entering and leaving the location depicted, making it hard for the jury to know what was relevant in the video, especially due to circumstances that made it hard to discern who was who. *Id.* ¶ 63. By describing the interactions and movements of certain specific people shown in the footage, the court reasoned, the detective "helped the jury focus on the relevant action." *Id.* Hence, except for the detective's identification of a certain person as the defendant in that case, his opinion testimony was properly admitted. *Id.* ¶¶ 63-64.

¶ 24    This case is not meaningfully different from *Mister* or *Brown*. Moore's argument that Levigne should not have been allowed to offer his opinion about what the video showed because he did not personally observe the underlying events misses the mark because Levigne's testimony was based on his personal knowledge of the security footage, not the events themselves. In other words, his

testimony was "rationally based on [his] perception" of the video. Ill. R. Evid. 701(a) (eff. Jan. 1, 2011). Further, the footage depicted many different people moving about and interacting, and because Levigne had reviewed the footage himself, he was in a better position to explain to the jury not only what it was looking at but also its significance to the case being tried—including the fact that it appeared to depict the same individual inside the train station, outside the station, and inside the McDonald's at various points. So, his testimony about what the footage showed was "helpful to *** the determination of a fact in issue," which was the shooter's identity; or, at least, it was reasonable for the trial court to come to that conclusion. Ill. R. Evid. 701(b) (eff. Jan. 1, 2011).

¶ 25     Moore suggests that *Mister* is distinguishable because the witness there had viewed several hours of footage multiple times and the footage both lacked clarity and was hard to assess. He similarly contends that the footage in this case was "short" and "clear," making any "special explanation" by a witness familiar with the footage unnecessary, distinguishing it from *Brown*. We see no meaningful differences between those cases and this one. Although only specific, relevant portions of the footage were shown to the jury during Levigne's testimony, that does not mean that the footage was "short." The underlying exhibits are part of the record on appeal, and they comprise several hours of footage drawn from at least a dozen cameras from four different sources. Image clarity varied by camera; while some cameras produced fairly crisp images, others—including the POD camera, which was the only one that gave an unobstructed view of the start of the shooting—were not. Furthermore, unlike the casino employee in *Mister*, Levigne was working with footage captured by four distinct systems, not a unified surveillance set-up that allowed one to easily track the movement of any particular individual as he moved from one camera to the next. See *Mister*, 2016 IL App (4th) 130180-B, ¶ 25. So, if anything, the footage in this case was harder to assess, making Levigne's testimony more helpful to the jury than it otherwise would have been.

¶ 26     Moore also suggests that *Mister* is distinguishable because the witness there was a "civilian"—*i.e.*, not a police officer. That distinction is not relevant to the analysis under Rule 701. It would conceivably be relevant to the distinct question of exclusion under Rule 403, but beyond

vaguely characterizing the fact that Levigne is a police officer as "especially problematic," Moore offers no reason to think that Levigne's job made his testimony unfairly prejudicial in this case.

¶ 27    As alluded to above, the court in *Brown* ultimately concluded that the trial court erred in that case by allowing the detective to offer his opinion that one of the individuals depicted in the footage was the defendant, testimony which was not helpful to the jury because there was no reason to think that the detective, who did not know the defendant, was more likely to correctly identify him. *Brown*, 2017 IL App (1st) 142197, ¶ 64. In his brief, Moore emphasizes that, at the outset of his narration, Levigne did the same thing, identifying an individual shown in the footage not as a suspect but specifically as Moore. As he concedes, though, in this case, the trial court sustained the defense's objection to that improper testimony. That was a proper ruling, not an error. And Levigne's key opinion here—that the various videos all depict the same person—is not analogous to the improper identification testimony in *Brown* because, as already explained, Levigne's review of those videos during his investigation made it reasonable for the trial court to conclude that he was in a better position than the jury to make *that* comparison.

¶ 28    For similar reasons, Moore's argument is not helped by either *People v. Sykes*, 2012 IL App (4th) 111110, or *People v. Hampton*, 2021 IL App (5th) 170341. Those cases both involved videos that depicted the defendant doing something that was not entirely clear. In *Sykes*, the defendant— a store employee who was charged with theft—was captured on video interacting with a cash register. *Id.* ¶ 6. At trial, the store's loss-prevention manager opined that the video showed him cupping a bill in his left hand and putting it into his pocket. *Id.* The reviewing court found this testimony improper because the loss-prevention manager was not in a better position than the jury to interpret what the video showed. *Id.* ¶ 42. In *Hampton*, the defendant was charged with shooting and killing somebody outside a strip club, and he raised self-defense and defense of others. *Hampton*, 2021 IL App (5th) 170341, ¶ 3. The shooting and its aftermath were captured on security video, including footage showing an unknown individual removing some kind of object from the decedent's body after the shooting. *Id.* ¶¶ 5-20. At trial, a special agent with the state police opined that the object was not a gun, undercutting the claim of self-defense and defense of others. *Id.*

¶¶ 14, 19-20. On appeal, the court found that this testimony would have been excluded had counsel objected because there was no basis to conclude he was more likely to correctly identify the object. *Id.* ¶¶ 84-86. In both of those cases, there was no basis for concluding that the witnesses, neither of whom had witnessed the underlying events, were in a better position to discern what the video clips in question showed than a jury would be. Here, by contrast, Levigne's familiarity with the videos allowed the trial court to reasonably determine that he was in a better position than the jury to discern who was who in the various videos, making his opinion helpful to the jury's determination.

¶ 29 We recognize Levigne was not present and did not personally observe the shooting. Nevertheless, the trial court undoubtedly considered that Levigne had extensively reviewed and thoroughly analyzed the multiple surveillance videos prior to providing his testimony. Also, as noted in *Mister*, the jury was not required to accept his opinion, which was open to cross-examination, thereby allowing Moore to test Levigne's credibility, expose any biases, and clarify ambiguities. See *Mister*, 2016 IL App (4th) 130180-B, ¶ 78. Accordingly, we find the admission of his testimony was not an error and his narration would be helpful to the jury.

¶ 30 Kelly Fields's Identification of Moore

¶ 31 Next, Moore argues that the trial court erred by allowing Kelly Fields to offer her opinion that the person depicted in the surveillance footage was, in fact, Moore. He contends that because Fields had not seen him since he was a teenager, she was not in a better position than the jury to identify him from the video. We find it unnecessary to consider whether the trial court erred. Assuming that it did, any error was harmless.

¶ 32 An evidentiary error is harmless when there is no reasonable probability that it affected the jury's verdict. *People v. Stull*, 2014 IL App (4th) 120704, ¶ 104. The point of Fields's testimony was to establish that the person seen on various footage before and after the shooting—the person whom the State theorized was the shooter—was Moore. But three other witnesses offered the same opinion at trial: a police officer who had detained Moore only a few days before the shooting, a

guard at the McDonald's that Moore frequented, including on the day of the shooting, and most significantly, Moore's own mother. Fields's opinion that the person in the video was Moore merely added one voice to this chorus, one that was easily drowned out by the powerful effect of the defendant's mother identifying him as the person in the surveillance footage. There is no reasonable likelihood that it would have had any impact on the jury's evaluation of the evidence as to the shooter's identity. Hence, any error was harmless, so the admission of Fields's testimony does not provide a basis for reversing Moore's conviction.

¶ 33                                                    CONCLUSION

¶ 34        The trial court acted within its sound discretion when it permitted Detective Levigne to describe what was depicted in the security footage and to offer his opinion that various clips shown to the jury depicted the shooter. Even if the trial court erred by allowing Kelly Fields to opine that those same video clips depicted Moore, that error was harmless. Because no prejudicial error occurred, we affirm Moore's convictions.

¶ 35        Affirmed.